Lewis LANE, Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent,**

Darling & Company, Intervenor.

No. 22357.

United States Court of Appeals
District of Columbia Circuit.

Argued June 12, 1969.

Decided Oct. 14, 1969.

Mr. Jerry D. Anker, Washington, D.
C., for petitioner.

Mr. Hans J. Lehmann, Attorney, National Labor Relations Board, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Assistant General Counsel, and John D. Burgoyne, Attorney, National Labor Relations Board, were on the brief, for respondent.

Mr. Fred Leicht, Jr., St. Louis, Mo., with whom Mr. K. Norman Diamond, Washington, D. C., was on the brief, for intervenor.

Before WRIGHT, McGOWAN and ROBINSON, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

This case brings before us for review an order of the National Labor Relations Board involving the legality of an employer lockout. In September 1965, pursuant to a provision in its collective bargaining agreement, International Chemical Workers Union Local 127 notified Darling & Company that it desired to reopen and modify the existing agreement covering the workers at its East St. Louis plant. Bargaining began in mid-November 1965, but by December 16 no agreement had been reached, and the company locked its employees out. Bargaining then continued, a contract was eventually signed, and the employees returned to work in mid-February 1966. The union filed the charge involved in the present case with the Board, alleging that the company violated Section 8(a) (1) and (3) of the National Labor Relations Act [1] by locking its employees out at a time when there was no bargaining impasse. After a hearing, a Board trial examiner found the company guilty of

1. 29 U.S.C. § 158(a) (1) and (3) (1964).

Section 8(a)(1) and (3) unfair labor practices, but the Board reversed his decision and dismissed the complaint. We affirm.

## I

Darling & Company manufactures fertilizer at its plant in East St. Louis, Illinois. Because of the highly seasonal nature of the fertilizer business, about 70 per cent of the company's annual shipments are made during the company's "spring season" in April and May. The workers at the East St. Louis plant have been unionized continuously since 1945, and the labor negotiations of the past have been marked by recurrent disputes over work assignments. Two brief wildcat strikes, one in 1952 and one in 1957, occurred over manning and work assignments. Then in 1962 a six-month strike was triggered by a dispute over an individual work assignment, and the entire work assignment plan was renegotiated before the 1962 strike ended. During that strike, which began in January 1962, the company lost its entire spring season and did not ship any fertilizer.

The present dispute involves the 1965 contract negotiations. Although there were numerous other issues including medical insurance and wages, the major difference between the union and the company once again involved the work assignment plan. The union sought to return to the work assignment system which had been in effect prior to the 1962 strike. The company, which had found the pre-1962 plan unsatisfactory and had endured a six-month strike in order to change it, refused to consider reinstituting that plan. The company did indicate a willingness to modify its current plan if some acceptable alternative could be devised.

In the course of nine negotiating meetings between November 15 and December 8, the parties resolved most issues, but major disputes still existed over medical insurance, work assignments and wages.

During the course of numerous conferences on December 8, the union representatives informed the federal mediator meeting with the two sides that the union was prepared to strike over the work assignment issue "at a time of its own choosing." Nonetheless, in return for five company concesssions on various issues at the December 8 meetings, the union representatives agreed to submit the company package to a vote of the union membership. That package contained a modified work assignment plan which the company felt it could live with. It is not clear whether the union leadership agreed to recommend acceptance. At a meeting on December 12, the union members unanimously rejected the package, indicating their desire for more information on the company's medical insurance proposal and their dissatisfaction with the company's position on three other issues: wages, vacation scheduling and work assignments. On the basis of the unanimous vote of their members, the union leaders informed the company that they were holding out for a complete return to the old work assignment system.

At a subsequent meeting on December 14, the parties reached agreement on vacation scheduling, and the company provided the union with further information on medical insurance. But no progress was made on the dispute over wages and work assignments. The federal mediator did not set a further meeting and neither of the parties asked that one be set. Two days later, the employer laid off all the employees, and the union filed the charges which are involved in the present case.

## II

The Supreme Court's approach to Section 8(a)(1) and (3) of the Act is presently in a state of flux. As the Court itself has acknowledged, the basic issue at stake in these cases is the relative power to be accorded employers and unions in their economic battles.[2] In the

2. *See, e. g.,* NLRB v. Erie Resistor Corp., 373 U.S. 221, 228–229, 83 S.Ct. 1139, 10 L.Ed.2d 908, 94 A.L.R.2d 1147 (1963). *But see* NLRB v. Insurance Agents' In-

past, the analysis employed by the Court has focused more on the development of *per se* rules for assessing the motivation of the employer than on an *ad hoc* balancing of the competing interests of labor and management.[3] The Court's latest two cases,[4] however, suggest that it may be modifying its approach.

American Ship Building Co. v. NLRB, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965), is, of course, the case most nearly in point to the lockout presently before us. *American Ship* may also represent the high-water mark in the Court's use of a *per se* rule based almost exclusively on an employer's intent.[5] The American Ship Building Company operated a highly seasonal ship-repairing business. The employer had, in the past, been subject to both wildcat and authorized strikes just at the times when the press of urgent business made it most vulnerable. Thus the company approached the negotiation of a new contract in 1961 with some trepidation. Following a fruitless series of summer bargaining sessions which ended with the parties at an impasse and with the company's winter busy season rapidly approaching, the company locked its employees out. The union argued that the lockout violated Section 8(a)(1) and (3) of the Act. The Supreme Court, however, held that

> "an employer violates neither § 8(a) (1) nor § 8(a)(3) when, after a bargaining impasse has been reached, he temporarily shuts down his plant and

lays off his employees for the sole purpose of bringing economic pressure to bear in support of his legitimate bargaining position." [6]

In reaching this conclusion, the Court separated the Section 8(a)(1) and Section 8(a)(3) violations. It held that, in order to find a violation of Section 8(a)(1), the Board had to find that the lockout was "one of those acts which are demonstrably so destructive of collective bargaining" [7] that no evidence of illegal intent on the part of the employer need be shown, or else the Board had to prove an antiunion animus on the part of the employer. The Court held that the *American Ship* lockout was not an act which enabled the Board to presume illegal intent. The Court also found that there was no evidence and no finding of an illegal motive. Consequently, it held there could be no violation of Section 8 (a)(1).

Similarly, the Court found that there must be evidence of antiunion motivation under Section 8(a)(3) to make out a violation. Such evidence could be dispensed with only if the employer's practice was "inherently so prejudicial to union interests and so devoid of significant economic justification" [8] that no specific antiunion animus was required. And again the Court held that in the circumstances of *American Ship* a bargaining lockout did not come within that category. Therefore, unless an illegal purpose on the part of the employer could be proved or presumed, there was no unfair labor practice.

ternational Union, 361 U.S. 477, 498, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). *See generally* Summers, Labor Law and the Supreme Court: 1964 Term, 75 Yale L.J. 59, 70–74 (1965).

3. *See* American Ship Building Co. v. NLRB, 380 U.S. 300, 85 S.Ct. 955 (1965) ; Christensen & Svanoe, Motive and Intent in the Commission of Unfair Labor Practices: The Supreme Court and the Fictive Formality, 77 Yale L.J. 1269 (1968) ; Oberer, Lockouts and the Law: The Impact of *American Ship Building* and *Brown Food*, 51 Cornell L.Q. 193, 212 (1966).

4. NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967) ; NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed. 2d 1027 (1967).

5. *See* Christensen & Svanoe, *supra* Note 3, at 1321.

6. 380 U.S. at 318, 85 S.Ct. at 967.

7. *Id.* at 309, 85 S.Ct. at 962.

8. *Id.* at 311, 85 S.Ct. at 964.

In two later cases, however, the Court seems to have retreated from its *per se* approach in *American Ship*. In NLRB v. Great Dane Trailers, Inc., 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), the Court added to its *American Ship* formulation a new category covering employer conduct which had only a "comparatively slight" [9] adverse effect on employee rights. *Great Dane* held that to make out a Section 8(a)(3) violation in these cases antiunion motivation need not be proved unless the employer demonstrates that there were "legitimate and substantial business justifications for the conduct." [10] The subsequent case of NLRB v. Fleetwood Trailer Co., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967), applied this analysis to Section 8(a)(1) violations as well as unfair labor practices under Section 8(a)(3). [11] In both *Great Dane* and *Fleetwood,* once the union has shown some adverse effect upon the rights of the employees, the employer must bear the burden of establishing the "legitimate and substantial business justifications for the conduct." [12]

The Court, therefore, has established two categories of Sections 8(a)(1) and 8(a)(3) violations which do not require proof of antiunion animus. First, employer conduct which is "inherently destructive" of employee rights is an unfair labor practice whether or not such conduct was based upon important business considerations. Second, employer conduct which has only a "comparatively slight" impact on the rights of employees will also be held an unfair labor practice unless the employer comes forward with evidence of "legitimate and substantial" reasons to justify his conduct. Perhaps the most significant part of this test is the Court's requirement that the reasons advanced be substantial. Apparently the employer must demonstrate that his interest in pursuing the conduct at least balances the harm inflicted on the rights of the employees. Otherwise, the Court will find that an unfair labor practice has been made out with no proof of an antiunion motive. Only if the employer meets his burden will the Court require proof of an antiunion animus.

*Great Dane,* therefore, seems to adopt a more flexible approach than that taken in *American Ship.*[13] We do not suggest, however, that *result* reached in *American Ship* is undercut in any way. The Court clearly held that the lockout after impasse, given the facts of that case, did not fall into the category of conduct "inherently destructive" of employee rights.[14] Moreover, the strength of the union in *American Ship,* the prior history of strikes at crucial times against a highly seasonal business and the company's good-faith bargaining to impasse formed the basis for the Court's further judgment that the impact of the lockout on the rights of employees was minimal and that the lockout served a legitimate business interest in a significant fash-

---

9. 388 U.S. at 34, 87 S.Ct. at 1798.

10. *Ibid.*

11. For an extensive discussion of the role motive has played in Supreme Court cases, *see* Christensen & Svanoe, *supra* Note 3.

12. NLRB v. Great Dane Trailers, Inc., *supra* Note 4, 388 U.S. at 34, 87 S.Ct. at 1798: NLRB v. Fleetwood Trailer Co., *supra* Note 4, 389 U.S. at 378, 88 S.Ct. at 546.

13. It should be noted that Chief Justice Warren wrote for seven members of the Court in *Great Dane.* The Chief Justice did not join the Court's opinion in *American Ship,* but joined instead Mr. Justice Goldberg's separate opinion concurring in the result. American Ship Building Co. v. NLRB, *supra* Note 3, 380 U.S. at 327, 85 S.Ct. 955. Mr. Justice Stewart, the author of *American Ship,* joined Mr. Justice Harlan's dissent in *Great Dane.* NLRB v. Great Dane Trailers, Inc., *supra* Note 4, 388 U.S. at 35, 87 S.Ct. 1792.

14. American Ship Building Co. v. NLRB, *supra* Note 3, 380 U.S. at 309, 312, 85 S.Ct. 955.

ion.[15] These two findings clearly make the result in *American Ship* compatible with the tests enunciated in *Great Dane*.[16]

We believe that the principles enunciated by Chief Justice Warren in *Great Dane* are the present law governing Sections 8(a)(1) and 8(a)(3).

### III

Applying these principles to the instant case, we conclude that the Board properly dismissed the complaint against the company. Although the parties have sought to have us establish a *per se* rule regarding the propriety of a lockout before impasse, we do not believe it either necessary or wise to do so, particularly since the Supreme Court seems to be moving in the opposite direction. "[T]he problem of lockouts requires 'an evolutionary process,' not 'a quick, definitive formula,' for its answer." American Ship Building Co. v. NLRB, *supra*, 380 U.S. at 337–338, 85 S.Ct. at 977 (Mr. Justice Goldberg, concurring in the result).

In the instant case, the company engaged in ten negotiating sessions with the union before the lockout and six afterward. At no point was there an allegation of bad faith bargaining on the part of the company. Furthermore, similar to the situation in *American Ship,* the union involved was strong and had been organized for a substantial period. During the negotiations involved in this case, the company made numerous concessions to the union, and disagreement had been narrowed to a few issues. Severely aggravating the situation, however, was the disagreement over the work assignment issue which had been the subject of a long strike some years earlier. Moreover, the union had stated it was ready to strike over this issue "at a time of its own choosing." The company, engaged in a highly seasonal business, clearly faced the prospect of "unusual harm" [17] from a strike during its peak season when 70 per cent of its annual production is shipped in a two-month period.

Under these circumstances we think that the Board's finding that there was no violation of either Section 8(a) (1) or Section 8(a) (3) was amply supported by the record. Under the tests laid down in *Great Dane*, we think it clear that the lockout here was not "inherently destructive" of the rights of the company's employees. Second, we think it equally clear that there were "legitimate and substantial" business interests justifying whatever comparatively slight impact the lockout in this case may have had on employee rights. Since there was no evidence or allegation that the employer acted on the basis of an antiunion motive, there could be no finding of an unfair labor practice.

Petition dismissed.

Circuit Judge McGOWAN concurs in the result.

---

15. *Id.* at 308–311, 85 S.Ct. 955. *See also id.* at 337, 85 S.Ct. 955 (concurring opinion of Mr. Justice Goldberg).

16. Moreover, Mr. Justice Goldberg's concurring opinion in *American Ship*, utilizing an even more open-ended balancing test than that approved in *Great Dane*, also approves the *American Ship* lockout. American Ship Building Co. v. NLRB, *supra* Note 3, 380 U.S. at 327–342, 85 S.Ct. 955.

17. *Id.* at 337, 85 S.Ct. 955, 13 L.Ed.2d 855.