**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DENNISON MANUFACTURING COMPANY et al., Respondents.**

No. 7304.

United States Court of Appeals
First Circuit.

Dec. 10, 1969.

Rehearing Denied Jan. 12, 1970.

Certiorari Denied April 6, 1970.
See 90 S.Ct. 1264.

Baruch A. Fellner, Washington, D. C., Attorney, with whom Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Elliott Moore, Washington, D. C., Attorney, were on brief, for petitioner.

Louis Chandler, Boston, Mass., with whom Alan S. Miller and Stoneman & Chandler, Boston, Mass., were on brief, for Dennison Mfg. Co., respondent.

Robert Weihrauch, Worcester, Mass., for Dennison Employees Committee, respondent.

Before ALDRICH, Chief Judge, WOODBURY*, Senior Circuit Judge, and COFFIN, Circuit Judge.

COFFIN, Circuit Judge.

On losing a representation election in June 1965 at two Massachusetts plants of the Dennison Manufacturing Company [Company], the United Papermakers and Paperworkers, AFL-CIO [Papermakers] objected to the conduct of the election and charged that the Company had "dominated and interfered with the formation and administration" of the 46-year-old Dennison Employees Committee [Committee] and had "contributed financial and other support to it." The Regional Director of the National Labor Relations Board subsequently consolidated the representation case and the unfair labor practice case and issued a complaint alleging that the Company had rendered unlawful aid, assistance, and support to the Committee in violation of section 8(a) (2) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. (1964).[1]

The trial examiner found that there was illegal assistance—indeed, "massive assistance * * * far beyond the point of tolerance"—but in view of the limited allegations in the complaint and the stance of General Counsel during the

hearing (*see infra*), he abstained from finding "domination" of the Committee by the Company. Before the Board, the Papermakers excepted to the examiner's refusal to find domination. General Counsel filed no exceptions or motions to amend its complaint even at this stage, see 29 C.F.R. § 102.17, but rather in its brief urged the Board to find domination.

The Board, despite the fact that the complaint's allegation of a section 8(a) (2) violation was specifically limited to the acts of recognition, financial support, and maintenance of an oral contract, held that the complaint was sufficiently broad to encompass domination. It recognized, however, that the Company had not been confronted with this issue at the first hearing and so, in the interest of fairness, remanded the case to the trial examiner for further hearing on the domination issue so that the Company could raise any defenses and the parties could proffer additional evidence and argument.

Thereupon, a year after the first hearing, a second hearing was held before the same trial examiner, which resulted in a finding of domination and a recommendation that the Committee be disestablished and that a new election be held to determine whether the Papermakers represented a majority of the Dennison employees. The Board adopted the findings and recommendations of the hearing examiner—168 NLRB No. 131 (1967)—and now seeks to enforce its order.

The initial question before us is whether the Board's remand for a second hearing was lawful. The Board based its authority for that remand on its conclusion that "the allegation of a violation of Section 8(a) (2) in the complaint is sufficient to include an allegation of employer domination." We disagree.

---

* By designation.

1. Section 8(a) (2) provides, in relevant part, that
 "It shall be an unfair labor practice for an employer—to dominate or inter-
fere with the formation or administration of any labor organization or contribute financial or other support to it:
* * *."

The Papermakers' charge against the Company alleged both domination and the contribution of financial and other support. The complaint issued by the Regional Director some seven weeks later alleged, in paragraph 7, that the Company was "rendering unlawful aid, assistance and support to the Committee" by (a) recognizing the Committee as exclusive bargaining agent, (b) contributing financial and other support to it, and (c) maintaining an oral contract with the Committee providing for wages, hours, and working conditions. Paragraph 8 of the complaint alleged: "By the acts described above in paragraph 7, Respondent did engage in and is engaging in unfair labor practices within the meaning of Section 8(a) (2)." No reference to domination was included although, as the trial examiner properly noted, and General Counsel concedes, the word has achieved "the stature of a word of art". This deleted part of the original charge was not mere verbiage, nor could its deletions have been inadvertent: section 8(a) (2) has traditionally been viewed as encompassing two distinct types of violations, for proof of illegal assistance or interference results in the withholding of recognition until proper certification, whereas proof of domination signals the death knell for a labor organization. The Carpenter Steel Co., 76 NLRB 670 (1948); Hershey Metal Products Co., 76 NLRB 695 (1948).

Two of the acts alleged in the complaint—recognition and maintenance of an oral contract—give only an attenuated inference of domination, despite the requirement that the complaint give a clear and concise description of the acts which are claimed to constitute unfair labor practices. 29 C.F.R. § 102.15. The third allegation, "contributing financial and other support," used the precise words of the part of section 8(a) (2) *not* dealing with domination. In response to the Company's motion for a bill of particulars concerning the "other support" allegation, the General Counsel stated that the reference was to such conduct as allowing the Committee to use Company office and clerical staff, permitting Committee officials access to employees on Company premises and time, and endorsing the Committee and its achievements during pendency of various petitions filed by other unions. Again there was no direct reference to nor clear inference of a charge of domination. The trial examiner ruled that only illegal assistance had been alleged and so limited the evidence, to which the General Counsel took no exception.[2]

It was worse than bad procedural manners for the General Counsel to play cosy on this record by simply arguing for domination in its brief to the Board; this was a matter of substance. Unlike the situation in Owens-Corning Fiberglas Corp. v. N.L.R.B., 407 F.2d 1357, 1361 (4th Cir. 1969), chiefly relied on by the Board in its brief, the distinction between a finding of domination and assistance is not a "distinction * * * without a difference." *See* The Carpenter Steel Co., *supra*. Nor could it be said that paragraph 8 of the complaint—alleging specific acts violative of section 8(a) (2)—has any efficacy as a "catchall" clause. *Cf.* Boyle's Famous Corned Beef Co. v. N.L.R.B., 400 F.2d 154, 161–163 (8th Cir. 1968). The Board's syllogism is that because some acts were alleged which violate section 8(a) (2), and because that section also proscribes domination, domination was alleged. However, a specification of parts which are included in the whole is not a specification of the whole; when one orders apples at a market, he does not expect to be confronted with pears, although both are

2. The General Counsel was obviously flirting with the concept of domination but did not, via a motion to amend, propose marriage. His response to the trial examiner's ruling was Delphic: "I do not want to sound disrespectful, but I do know what I'm doing here, and I am aware of what the Complaint alleges. I am aware of * * * the words I'm using, and I'll leave it at that, Mr. Trial Examiner."

fruit. We have found no cases allowing the expansive interpretation of a complaint which the Board now urges on us.[3] We conclude that proper procedure called for an amendment which, under the regulations, can be made after submission of a case to the Board. 29 C.F.R. § 102.17.

Our question therefore is whether, in light of General Counsel's failure to seek this substantive amendment, the Board can, in effect, *sua sponte* do it for him. The Company argues that by so acting the Board "usurped the exclusive powers of the General Counsel in violation of section 3(d)," which provides:

"The General Counsel of the Board * * * shall have final authority, on behalf of the Board, in respect of the * * * issuance of complaints * * * and in respect of the prosecution of such complaints before the Board." 29 U.S.C. § 153(d) (1964).

This section became part of the National Labor Relations Act with the passage of the Taft-Hartley Act in 1947. Section 3(d) accompanied other provisions designed to separate the functioning of the Board from the functioning of the General Counsel, thereby leaving the prosecutorial role to the General Counsel while limiting the Board to the performance of quasi-judicial functions. H.R.Rep. No. 510, U.S.Code Congressional Service, 80th Cong., 1st Sess. (1947), p. 1143.

Were this all the statute provided, we would have no difficulty concluding that the Board lacked power to amend on its own motion. However, there remains section 10(b), a part of the original Wagner Act which was not deleted when section 3(d) was added in 1947. Section 10(b) provides that any complaint "may be amended by * * * the Board in its discretion at any time prior to the issuance of an order based thereon." 29 U.S.C. § 160(b) (1964).

We are fully aware that there may be some inconsistency between these two provisions. *See* International Union of Electrical, Radio, and Machine Workers v. N. L. R. B., 110 U.S.App.D.C. 91, 289 F.2d 757, 760–762 (1960). However, when the Board's action supports the position taken by the General Counsel, we see no conflict between section 3(d) and 10(b), no usurpation of the General Counsel's prosecutorial function.[4] To read section 10(b) out of the Act in the absence of any conflict with section 3(b) would be not only an act of judicial repeal but would also deprive the Board of any power to act in the public interest in just such a circumstance as this,

---

3. *See e. g.*, S. S. Kresge Co., K-Mart Division v. N.L.R.B., 416 F.2d 1225, 1234–1235 (6th Cir. 1969); Engineers & Fabricators, Inc. v. N.L.R.B., 376 F.2d 482, 485–486 (5th Cir. 1967); N.L.R.B. v. Majestic Weaving Co., 355 F.2d 854, 861–862 (2d Cir. 1966); N.L.R.B. v. H. E. Fletcher Co., 298 F.2d 594, 600 (1st Cir. 1962).

4. *Accord:* International Union of Electrical, Radio, and Machine Workers v. N.L.R.B., 110 U.S.App.D.C. 91, 289 F.2d 757, 760–762 (1960); United Steelworkers of America v. N.L.R.B., 129 U.S.App. D.C. 260, 393 F.2d 661, 664 (1968); Wellington Mill Division, West Point Mfg. Co. v. N.L.R.B., 330 F.2d 579, 590 (4th Cir. 1964), cert. denied, 379 U.S. 882, 85 S.Ct. 144, 13 L.Ed.2d 88 (1964); Piasecki Aircraft Corp. v. N.L.R.B., 280 F.2d 575, 586–588 (3d Cir. 1960), cert. denied, International Union United Auto, Aircraft and Agr. Implement Workers of America v. N.L.R.B., 364 U.S. 933, 81 S.Ct. 380, 5 L.Ed.2d 365 (1961); N.L. R.B. v. Bar-Brook Mfg. Co., 220 F.2d 832, 834 (5th Cir. 1955).

We venture no opinion on whether the Board can make an amendment pursuant to section 10(b) which the General Counsel opposes. *But see* American Newspaper Publishers Ass'n v. N.L.R.B., 193 F.2d 782, 798–800 (7th Cir. 1951), cert. denied, International Typographical Union v. N.L.R.B., 344 U.S. 816, 73 S.Ct. 11, 97 L.Ed. 635 (1952); Frito Company, Western Division v. N.L.R.B., 330 F.2d 458, 465 (9th Cir. 1964), explained more fully in Retail Clerks Union v. Food Employers Council, Inc., 351 F.2d 525, 530 & n. 4 (9th Cir. 1965) and Associated Home Builders of Greater East Bay, Inc. v. N.L.R.B., 352 F.2d 745, 752–754 (9th Cir. 1965); American Boiler Mfg. Ass'n v. N.L.R.B., 366 F.2d 815, 821 (8th Cir. 1966).

where the General Counsel has indicated his position but misconceived his procedural approach.

The question remains whether we render a disservice either to the Company in this case or to the future orderly conduct of Board proceedings by treating the Board's broad interpretation and remand as a *sua sponte* exercise of its amendment power under section 10(b). We think not. The issue of the scope of the complaint was a live one when the case was submitted to the Board, for the Papermakers had excepted to the trial examiner's failure to find domination and the General Counsel had sought through its brief to the Board a finding of domination. The Board did not, therefore, unearth an issue which the Company had no reason to know of in advance. More importantly, the action taken served the purposes of an amendment; not only was a new hearing had on the new charge, but the Company was fully apprised, as a result of the first hearing, of the evidence which might be weighed against it. Were we to say that what could have been accomplished by a motion to amend could not be done by action which accomplished the same purposes, we would honor form without regard for the function which form serves. As for the future regularity of proceedings, we see no advantage to the General Counsel or the Board in bypassing the amendment procedure; a new hearing is still required if the party was not confronted with the added charge at the first hearing, so that time is not saved, nor the record shortened, nor argument abbreviated by the use of interpretation rather than amendment. Thus, because the Board had the power to amend the complaint in these circumstances and should be treated as having exercised it, the Board's remand was valid.

■ Both the Company and the Committee contend, however, that even if the remand was within the Board's power, the second hearing violated due process because they were restricted by the trial examiner to introducing evidence which had not been adduced at the first hearing, which ruling prevented their putting their case in the sequence and manner they deemed appropriate. In addition, they insist that the record demonstrates such bias and unfairness on the part of the trial examiner that the hearing was a travesty.

Concerning the ruling restricting the Company and the Committee to additional evidence, this was in accord with the mandate of the Board, reaffirmed by the Board over a motion for reconsideration. We see no prejudice on these facts. Of some 27 exhibits which were offered during the second hearing, almost all were admitted; the few which were rejected were either replaced by acceptable substitutes or were irrelevant. Testimony sought to be admitted and initially rejected was either eventually admitted or egregiously repetitive. The hearing turned out to be substantially *de novo*, the trial examiner sensibly concluding that wide latitude in admitting evidence would save more time than haggling over each proffer. We concede, as we did in N. L. R. B. v. H. E. Fletcher Co., 298 F.2d 594, n. 5 (1st Cir. 1962), that there are situations in which piecemeal hearings may be significantly prejudicial because they prevent counsel from trying a case as he sees fit. Here, however, there has been no indication how counsel for the Company (or counsel for the Committee) would have proceeded differently, except to have been less cooperative in stipulating facts, which seems to us a matter of questionable tactics rather than of substance. Moreover, both the Company and the Committee knew what they had to confront in the second hearing: a constitution calling for management representation on a number of important committees combined with a half century history of intimate relationship between the Company and the Committee. A defense would necessarily require proof of independent Committee action and arms-length dealing in fact, and this kind of evidence

was fully introduced at the second hearing.[5]

 The contention that the trial examiner's conduct precluded a fair hearing must also be rejected. Not only was there no formal objection during the hearing, in accordance with 29 C.F.R. § 102.41, but there was no substantial showing of such personal bias as would support such a charge. Converse v. Udall, 262 F.Supp. 583, 590 (D.Or.1966); cf. N. L. R. B. v. Federal Dairy Co., 297 F.2d 487 (1st Cir. 1962); Bituminous Material & Supply Co. v. N. L. R. B., 281 F.2d 365, 372 (8th Cir. 1960). The hearing, it is true, was an unseemly succession of *ad hominem* remarks by all except counsel for the Papermakers, whose participation was minimal. We have carefully scrutinized the record of the two-day hearing on remand and identified some 35 occasions of demeaning exchange among counsel and between the trial examiner and counsel. In part this is perhaps endemic to a hearing before the same examiner who presided over the first hearing and ruled against the Company. While this is not a basis for requiring a new examiner, N. L. R. B. v. Donnelly Garment Co., 330 U.S. 219, 236–237, 67 S.Ct. 756, 91 L.Ed. 854 (1947), it goes far to explain the atmosphere of

tension and unmannerliness in the second hearing, which was completely absent from the first. The antagonism may also have stemmed from the appearance on the scene of counsel for the Committee,[6] whose unfamiliarity with the first hearing and applicable procedures exacerbated an already difficult situation.

It was an unhappy hearing—the record sheds luster on no one—but all the relevant evidence was admitted and, as far as we can tell from our careful reading of the record, fairly considered. Unfortunate antagonism does not necessarily become prejudicial bias, and we have found no evidence in the record that it did so here. Bearing in mind that we do not have advisory power over administrative agencies, *Donnelly Garment, supra* at 237, 67 S.Ct. 756, we conclude that due process was accorded the Company and the Committee during the second hearing.

That there was substantial evidence of domination by the Company is clear. *See* n. 5 *supra*. We deal with a labor organization whose General Body is closer to management than to its own constituents; whose constituents merely vote for representatives to the General Body, never meet with it, do not pay dues, have no opportunity to discuss is-

---

5. The evidence duplicated in both hearings included the following: the employees could only vote for their representatives on the Committee, having no other voice, no meetings, and no dues; the Committee met on Company premises, was fully funded and supplied by the Company, posted its bulletin notices after Company approval; the Committee and the Company had equal membership on a Procedure Committee which received and channeled all reports of other committees and were equally represented on various standing committees; those eligible for voting and Committee office holding included members of other craft unions; records were kept in Company space without restriction to Committee access; amendments to the Constitution which altered the relationship between employees and Company had to be submitted to the Company.

The additional evidence in the second hearing included the following: the at-

tempts of the Committee to seek changes in an incentive plan; the necessity of joint Company-Committee amendment to the Constitution to provide for mediation; the elimination of one department—and thus a Committee member—by the Company; the story of the 1961 negotiations of the Wages and Fringe Committee—tending to prove either Committee intransigence or subservience, depending on one's point of view; and a detailed description of the grievance machinery.

6. The Committee had not been represented by counsel during the first hearing, apparently because its continued existence was not directly threatened in the absence of a "domination" allegation. However, its absence from the first hearing presents no fairness problem. N.L.R.B. v. Pennsylvania Greyhound Lines, 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831 (1938); Pittsburgh Plate Glass Co. v. N.L.R.B., 313 U.S. 146, 155, 61 S.Ct. 908, 85 L.Ed. 1251 (1941).

sues before they are resolved, and do not ratify decisions after they are made. Assuming that the General Body at times takes positions antithetical to management, these occasions have been rare and the entire process of Committee decision-making could be found to be unduly subject to management influence. What was sound thinking about labor-management relations when the Committee was founded in 1919 is not necessarily the legal minimum in 1969.

The petition for enforcement is granted.

"Per Curiam. The petition for rehearing is denied. The fact that the Board "may" amend a complaint "upon motion," 29 C.F.R. § §102.17, does not mean that it cannot do so *sua sponte* under section 10(b) of the Act.

By the Court: