LACLEDE GAS COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Local 5-6, Oil, Chemical and Atomic
Workers International Union,
AFL-CIO, Intervenor.

No. 19518.

United States Court of Appeals,
Eighth Circuit.

Feb. 4, 1970.

Rehearing Denied and Rehearing En
Banc Denied March 30, 1970.

Harold I. Elbert, of Susman, Willer, Rimmel & Elbert, St. Louis, Mo., for petitioner.

Hans J. Lehmann, Atty., N.L.R.B., Washington, D. C., for respondent; Arnold Ordman, Gen. Counsel, N.L.R.B., Dominick L. Manoli, Associate Gen. Counsel, N.L.R.B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B. and John D. Burgoyne, Atty., N.L.R.B. on the brief.

Charles A. Werner, St. Louis, Mo., for intervenor Local 5–6, Oil, Chemical and Atomic Workers International Union, AFL–CIO.

Before VAN OOSTERHOUT, Chief Judge, and LAY and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

The National Labor Relations Board, in a decision and order reported at 173 NLRB No. 35, 69 LRRM 1316 (1968), found that Laclede Gas Company's failure to bargain with the Union regarding deviation from existing seniority practices in reducing its work force constituted an unfair labor practice under § 8(a) (5) of the National Labor Relations Act, 29 U.S.C. § 158 (1965). Laclede was ordered to cease and desist from such violation and to make whole the employees improperly laid off. Laclede has applied to this Court for review of that order, and the Board, by cross-application, has requested enforcement of the order. We hold that the reduction in work force was a lockout rather than a layoff, and that Laclede was not obligated to bargain with respect to it. We refuse to enforce this order of the Board, but we remand the matter to the Board to permit it to determine whether the lockout was violative of § 8(a) (1) and (3) of the Act.

Laclede is a public utility furnishing gas to the metropolitan St. Louis area. Local 5–6, Oil, Chemical and Atomic Workers International Union, AFL–CIO, represents the Company's 1,400 operating employees.[1] The bargaining unit is composed of eight separate departments, of which the Street Department, with about 700 employees, is the largest. The Street Department, the center of the present controversy, is divided into nine operating divisions: three street divisions, three equipment divisions and three leak divisions. Seniority is along departmental rather than divisional lines. The collective bargaining agreement contained the following provision controlling layoff procedure:

"In the event it becomes necessary to reduce the working force in any department because of lack of work, employees in such department shall be laid off in inverse seniority order; that is, the employee with the least departmental seniority shall be the first laid off. Family status shall be given consideration when seniority is equal."

Additionally, the agreement provided that an employee with less than one year's seniority could be "bumped" by an employee from any department who had more seniority.

1. Laclede's 400 clerical employees are represented by a sister union, Local 5–194.

## THE 1967 CONTRACT NEGOTIATIONS

The collective bargaining agreement was scheduled to terminate on July 31, 1967. Negotiations towards a new contract began on July 10, but as of the termination date, agreement had not been reached on a number of issues, including wages, supervisory work, holidays and length of the new agreement. Although the past practice of the Union had been to refuse to work in the absence of a contract, the Union's position during these negotiations was that it did not intend to strike. The parties continued to negotiate during three consecutive short-term extensions, the last one terminating at 8:00 A.M., August 4. Some progress was made during the extensions, but no final agreement was reached. Additional extensions could not be agreed to because the Union insisted on extensions terminating during the heating season, and the Company insisted on extensions which would terminate thereafter. The Union repeated at this point that it was ready to resume negotiations at any time and that it would continue to work without a contract.

## THE ALLEGED VIOLATION

On the morning of August 4, 1967, the Company suspended all but emergency construction work and instructed approximately 336 employees to go home, stating that there was a lack of work.[2] The employees sent home were primarily members of the construction and mainte-

nance or street division of the Street Department, along with a few equipment operators who assist this division. Neither departmental nor Company-wide seniority rights were followed in reducing the work force. The other divisions in the Street Department and the other departments were not affected by this shutdown, and the Company continued to operate in a normal fashion.

The Company prepared to shut down construction activities about ten days before the expiration of the contract. This preparation was said to be a normal Company practice whenever the labor contract was about to expire. There is no evidence that this practice had previously resulted in a layoff.[3] The shutdown preparations consisted of expediting and completing work projects in process and delaying the start of new ones. It is apparent there was work available, but the Company purposefully refused to begin it.

During the three days of contract extensions, the construction crews continued to work on a day-to-day basis. The Company testified, however, that such day-to-day operation was ineffective and inefficient since the Company was unwilling to begin any major projects in the face of a possible strike. The Company further testified that it was apprehensive that a strike would occur despite the Union's assurances to the contrary. It based its belief on the fact that the Union had struck on a number of occasions in the past.[4] The Company stated that it felt the Union's no-strike stand

2. The employees sent home were told by their supervisors, when they reported for work, that there was "no work for them" and that they would be notified when to return to work. The number of employees laid off or locked out increased from 336 on August 4, 1967, to 339 on August 10, the day before they were returned to work.

3. There is no indication, however, that the Company had previously faced this situation. The prior Union practice of refusing to work without a contract might have relieved the Company of initiating this action.

4. The record indicates that there was a fourteen-day strike in 1956, a two-day strike in 1960, a nine-day strike in 1962 and a thirty-two-day strike in 1965 when the last contract had been agreed to.

The record indicates that during the 1965 strike, a substantial amount of destructive activity occurred. The activity included destruction of meters and regulators, injection of water into mains, dynamiting of a main and burning of a foreman's automobile.

might have been merely a tactic to postpone the strike until the heating season when the impact of a strike would be the greatest.

## THE PROCEEDINGS BEFORE THE BOARD

On August 4, 1967, the Union charged Laclede with engaging in unfair labor practices within the meaning of § 8(a) (1), (3) and (5) of the Act. It alleged: (1) that Laclede "laid off and locked out approximately 400 construction and maintenance employees because of their union or concerted activity in order to discourage membership in or activities on behalf of" the Union; (2) that Laclede "failed * * * to bargain collectively and in good faith with [the Union] by unilaterally changing the terms and conditions of employment in laying off employees not in accordance with seniority."

The Union further alleged that by the above acts and other acts and conduct, Laclede interfered with, restrained and coerced its employees in the exercise of rights guaranteed to them by § 7 of the Act.

On August 11, the parties reached an agreement on a procedure to resolve the substantive issues and the construction crews were recalled to work.[5]

On November 16, the Regional Director of the Board advised the Union that he was refusing to issue a complaint "on this 8(a) (3) and (5) [6] allegation * * * because there is insufficient evidence that the Employer's action in locking out construction and maintenance employees was because of their Union or concerted activity or in order to discourage membership in or activities on behalf of the Union." He added that he was not dismissing the "allegations of the charge which allege as violative a unilateral change in condition of employment by selecting employees in a manner other than in accord with the established seniority system."

The Union appealed the decision of the Regional Director to the General Counsel. The General Counsel denied the appeal stating:

" * * * [T]he evidence in its entirety established that at the end of the last bargaining session prior to the lockout the parties were at impasse on two substantial issues, i. e., wages and the performance by foremen of unit work. See American Shipbuilding Co. v. N.L.R.B., 380 U.S. 300 [85 S.Ct. 955, 13 L.Ed.2d 855]. * * * [T]here was no showing that the Company's failure to lock out clerical employees at the same time it locked out its production and maintenance employees was motivated by any consideration other than its own convenience." [7]

On November 21, a complaint was issued charging Laclede with a refusal to bargain within the meaning of § 8(a) (5) of the Act by unilaterally disregarding the established seniority system in laying off or locking out some of its employees "in other than inverse seniority order without first consulting and bargaining with * * * [the Union] concerning such [layoff or lockout] * * *." The complaint additionally alleged that the same acts constituted a violation of § 8(a) (1) as "interfering with, re-

5. The agreement, reached with the assistance of the Governor of Missouri, provided that the Union would not strike before August 1, 1968, and that the Company would return all employees to work. The agreement also provided for binding arbitration in the event that the parties could not resolve their remaining substantive differences.

6. We are unable to understand the Director's statement that he was refusing to issue a complaint on the § 8(a) (5) allegation. He did in fact issue a complaint alleging a violation of that section.

7. The second sentence of the quoted paragraph would seem to indicate that the General Counsel believes that under *American Ship*, a partial lockout is never a violation of §§ 8(a) (1) and (3) unless antiunion animus is demonstrated. For the reasons outlined in this opinion, we question whether *American Ship* can be read that broadly.

straining and coercing its employees in the exercise of the rights guaranteed in § 7 of the Act."

The Trial Examiner characterized the reduction in work force as a layoff and stated that N.L.R.B. v. Frontier Homes Corporation, 371 F.2d 974 (8th Cir. 1967), and Industrial Union of Marine & Shipbuilding Wkrs. v. N.L.R.B., 320 F.2d 615 (3rd Cir. 1963), cert. denied Bethlehem Steel Co. v. N.L.R.B., 375 U. S. 984, 84 S.Ct. 516, 11 L.Ed.2d 472 (1964), were controlling. He held that Laclede refused to bargain by failing to consult and negotiate with the Union before departing from established seniority procedures in "laying off" employees in the construction and maintenance division. He further held that because there were no special circumstances justifying the "layoff," [8] the Company's unilateral action was a refusal to bargain. He also noted that the question of whether an impasse had been reached on issues other than seniority was irrelevant and that it was sufficient to find that the issue of seniority had not been raised or discussed during negotiation.

The Board adopted the Trial Examiner's findings, conclusions and recommendations with modifications. The majority opinion emphasized the Trial Examiner's finding that the work reduction was a layoff. It further noted that seniority rights had not been a subject of negotiations and stated:

" * * * It * * * seems * * *

to us that [Laclede] was not privileged to alter the requirements of [the seniority and layoff procedures] without prior discussion with the Union, * * *. We are not persuaded by [Laclede's] argument that a temporary change is permissible although a permanent modification would not be lawful. The layoff provisions are

* * * intended to deal with * * * temporary cutbacks in operations and [Laclede] thus was failing to apply the established practice to the very situation for which it was adopted. * * *

" * * * [Laclede] argues * * * that the layoff was a partial lockout designed to ' * * * strengthen its hand at the negotiating table.' [It] contends that such a lockout, * * *, is a permissible exercise of employer power in a bargaining situation under the doctrine of American Ship Building Co. v. N.L.R.B., 380 U.S. 300 [85 S.Ct. 955, 13 L.Ed.2d 855] and that the right of lockout necessarily carries with it the right to deviate unilaterally from existing seniority practices as a temporary measure, without abridging Section 8(a) (5).

"We need not consider that contention because the evidence does not support the premise upon which [Laclede] builds its 'lockout' argument. For while [Laclede] now contends that the layoff was an affirmative bargaining stratagem, the evidence points to a finding that the layoff was actually necessitated by the exigencies of the business operation. * * * All of the evidence as to the reason for the carefully selective layoff indicates that it was motivated by a desire to eliminate those operations which negotiations had rendered tentative and to protect [Laclede] from over-extending itself at a critical moment. A layoff for these essentially defensive purposes does not justify a unilateral departure from the accepted layoff seniority practices of [Laclede]. * * *"

Member Brown concurred in the result, but stated that he would reach the same conclusion whether the reduction in force was characterized as a layoff or a lockout.

---

8. The Trial Examiner cited N.L.R.B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), and Webster Outdoor Advertising Company, 170 NLRB No. 144, 67 LRRM 1589 (1968), for the proposition that special circumstances could relieve a company of its duty to bargain over a change in conditions of employment. In our view of the case, we do not need to reach this question since we find no duty to bargain over this lockout.

We turn to a discussion of the issues presented on appeal. The Board asks that its order be enforced. The Company asks that enforcement be denied, arguing that under American Ship Building Co. v. N.L.R.B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965), and N.L.R.B. v. Insurance Agents' International Union, etc., 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1962), it had a right to temporarily lay off its employees out of seniority in order to carry on its business and to strengthen its hand at the bargaining table. The Union echoes the Board's position and argues, alternatively, that even if the purpose of the layoff was to support the Company's bargaining position, and thus a lockout, the reduction in work force must be in accordance with established conditions of employment.

In analyzing this case within the context of the § 8(a) (5) duty to bargain in good faith, it is essential, first, to characterize properly Laclede's reduction in work force. It was a lockout.[9] It was a refusal by Laclede to furnish available work to its regular employees. See, American Ship Building Co. v. N.L.R.B., supra, 380 U.S. at 321, 85 S.Ct. 955. The lockout characterization is a proper one whether the refusal was motivated by Laclede's desire to protect itself against economic injury,[10] by its desire to protect itself at the bargaining table, or by both.[11] Because the reduction in work force was a lockout, Laclede was not obligated to bargain with the Union with respect to its timing or its implementation. N.L.R.B. v. Insurance Agents' International, supra.

9. The term "lockout" is not susceptible of precise or uniform definition. The definition is often expressed in terms reflecting the context of its use. We have chosen to use Mr. Justice White's words as they succinctly state what we consider a practical definition of the term. Other helpful definitions are: "[The] * * * withhold[ing of] employment from a (body of employees) as a means of bringing them to accept the employers' terms." Webster's New International Dictionary (2d ed. 1945); "The temporary withholding of employment in order to serve some interest of the employer vis-a-vis his employees * * *," Oberer, Lockouts and the Law: The Impact of American Ship Building and Brown Food, 51 Corn.L.Q. 193, 194 (1966). See also, Duvin, The Bargaining Lockout: An Impatient Warrior, 40 Notre Dame Law. 137 (1965); Meltzer, Lockouts Under the LMRA: New Shadows on an Old Terrain, 28 U.Chi.L.Rev. 614 (1961).

10. See, e. g., American Ship Building Co. v. N.L.R.B., 380 U.S. at 327, 85 S.Ct. 955 (concurring opinion, Goldberg, J); Quaker State Oil Ref. Corp., 121 NLRB No. 49, 42 LRRM 1343 (1958); Betts Cadillac Olds, Inc., 96 NLRB No. 46, 28 LRRM 1509 (1951).

11. Characterizing a lockout as "defensive" or "offensive" is a difficult task at best. The Supreme Court faced the problem in American Ship Building Co. v. N.L.R.B., supra. That case was similar in many respects to this one. In both cases, the employer reduced its work force after an impasse was reached in the bargaining process. Each employer claimed to have been motivated by concern over possible losses caused by a strike and the possible timing of such a strike. In both cases, the employer rejected proposed contract extensions which would have expired at a time particularly inopportune to the employer. In American Ship, the majority opinion assumed, as the Board had determined, that the action was a bargaining lockout intended to bring economic pressure to bear on the employees. However, three Justices, concurring in the result, agreed with the Trial Examiner and thought that the conduct was primarily defensive in nature.

Furthermore, such characterization, if it can be made, may be merely superficial. As has been pointed out:

"Moreover, and more important, whatever the determination in a particular case might be, the fact remains that the defensive lockout has its primary significance as an attempt to improve the employers' bargain. If that proposition be conceded * * * it undermines the basic distinction which the Board has sought to maintain in the lockout context—that is, the distinction between * * * [offensive and defensive lockouts] * * *."

Meltzer Lockouts Under the LMRA: New Shadows on an Old Terrain, 28 U. Chi.L.Rev. 614, 621 (1961). See also, Oberer, Lockouts and the Law: The Impact of American Ship Building and Brown Food, 51 Corn.L.Q. 193 (1966).

In *Insurance Agents*, the union was charged with a refusal to bargain for using "harassing tactics" in support of its demands. The tactics included refusing to solicit new business, refusing to comply with the company's reporting procedures, reporting late at District Offices, refusing to perform customary duties at the offices, and staying away from special business conferences arranged by the company. The Court, in holding that such tactics did not constitute a refusal to bargain, stated:

> " * * * The presence of economic weapons in reserve, and their actual exercise on occasion by the parties, is part and parcel of the system that the Wagner and Taft-Hartley Acts have recognized. * * * [T]he truth of the matter is that at the present statutory stage of our national labor relations policy, the two factors—necessity for good-faith bargaining between parties, and the availability of economic pressure devices to each to make the other party incline to agree on one's terms—exist side by side.
>
> * * *
>
> * * * * * *
>
> " * * * The use of economic pressure, as we have indicated, is of itself not at all inconsistent with the duty of bargaining in good faith. * * * "

*Id.*, 361 U.S. at 489, 490–491, 80 S.Ct. at 427–428.

We recognize that *Insurance Agents* can be distinguished from this case on its facts. The most important difference is that, in the former, a strike was being considered and, in the latter, a lockout is being scrutinized. We do not consider the difference to be material here. In our view, neither an employer nor a union is required to bargain over the timing of a strike or a lockout or over the selection of the employees who will participate in the action. This is not to say that partial strikes and partial lockouts are never vi-

olative of the Act. It is only to say that the essence of the violation, if there is one, is the tactic[12] used rather than the failure to bargain over its use.

The Board's reliance on this Court's decision in N. L. R. B. v. Frontier Homes Corporation, 371 F.2d 974 (8th Cir. 1967), to create a duty on the employer to bargain with the union as a prerequisite for departing from established seniority rules in implementing the lockout, is misplaced. The reduction in work force in *Frontier Homes* was a "layoff." While it occurred after the contract expired and during negotiations, it was necessitated by a seasonal slowdown associated with the bargaining process. It was neither designed to protect Frontier Homes from economic loss during a potential strike nor to strengthen that company at the bargaining table. Frontier Homes was, therefore, obligated to follow established seniority procedures in laying off some of its employees.

The futility of requiring negotiations over strike or lockout tactics is apparent. It is unreasonable to expect union acquiescence in an employer's request that a lockout be timed and conducted in a manner likely to strengthen the employer's bargaining position; and it is equally unreasonable to expect that an employer would agree to the use of strike tactics designed to improve the union's negotiating posture. We add that, under the Board's view, the interest of the party seeking to use the tactic would be served equally by reaching an agreement or by bargaining to impasse.

For the reasons stated, we find that Laclede's failure to bargain with the Union before locking out its employees was not violative of § 8(a) (5) of the Act. There remains the question, however, whether the lockout was violative of § 8(a) (1) and (3) of the Act.

The allegations of the complaint were arguably broad enough to permit the Board to decide that the lockout was

---

12. The term "tactic" is used in this opinion to describe the particular devices used by Laclede to accomplish its ends.

violative of § 8(a) (1).[13] We also could arguably hold that the Board had in fact considered the question and reached a decision on the issue similar to that of the Regional Director and the General Counsel. If we did so, we might be able to reach the merits of the question on this appeal. But we will not do so. We think it is clear that neither the Examiner nor the Board considered the question.[14] Furthermore, Laclede has not had an opportunity to defend against the charge that the lockout was violative of these sections. Elementary concepts of due process would, therefore, be offended by our reaching out and deciding the issue in this proceeding. *Cf.,* Boyle's Famous Corned Beef Company v. N. L. R. B., 400 F.2d 154, 163–164 (8th Cir. 1968); American Newspaper Pub. Ass'n v. National Labor Rel. Bd., 193 F. 2d 782, 799–800 (7th Cir. 1951), aff'd, 345 U.S. 100, 73 S.Ct. 552, 97 L.Ed. 852 (1953).

We do, however, believe that it would be inappropriate for us to do nothing more than to deny enforcement of the Board's order: (1) The interest of the locked out employees in having the issue resolved on an appropriate theory of law is an important one. (2) The legal questions involved are important ones in the labor relations field and are not without doubt. (3) The applicable statute of limitations will probably foreclose the possibility of having the issue considered unless we set aside the order and remand.[15]

In the light of 29 U.S.C. § 160(e) and 28 U.S.C. § 2106, we perceive no jurisdictional limitation on our right to remand to the Board for the stated purposes. See, Kenneally v. First National Bank of Anoka, 400 F.2d 838, 843–844 (8th Cir. 1968), cert. denied, 393 U.S. 1063, 89 S.Ct. 716, 21 L.Ed.2d 706 (1969); United States v. Hall, 398 F.2d 383, 391 (8th Cir. 1968).

We, therefore, remand to the Board. This action will permit the Board to take such additional testimony as is necessary to determine whether the lockout was violative of §§ 8(a) (1) and (3). It will also permit Laclede to defend against that charge.[16]

13. The complaint alleged that Laclede "disregarded the established seniority system" in "laying off, locking out, furloughing or otherwise reducing part of its work force * * *, and that by so doing, did interfere with, restrain and coerce its employees in the exercise of rights guaranteed them under § 7, and did thereby engage in an unfair labor practice within the meaning of § 8(a) (1) of the Act."

14. The Trial Examiner stated:
"This aspect of the charge [the lockout as a violation of §§ 8(a) (1) and (3)] was dismissed by the Regional Director and his action was sustained on appeal by the General Counsel's Office of Appeals.
* * * * * *
"Accordingly, the legality of the Company's action in laying off the affected employees is not before me for decision and no view is expressed herein as to the correctness of the General Counsel's action."
The Board noted that the legality of the lockout was not at issue.

15. Section 10(b) of the Act, 29 U.S.C. § 160(b) (1965), provides:

" * * * [N]o complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board and the service of a copy thereof upon the person against whom such charge is made. * * * Any such complaint may be amended by the member, agent, or agency conducting the hearing or the Board in its discretion at any time prior to the issuance of an order based thereon."
The charge filed by the Union was within the six-month period and it included the issues which we remand to the Board. In our view, the right of the Board to amend the complaint extends to the present situation where the order of the Board has been set aside and the matter remanded to the Board. See, American Newspaper Pub. Ass'n v. National Labor Rel. Bd., 193 F.2d 782, 799–800 (7th Cir. 1951), aff'd, 345 U.S. 100, 73 S.Ct. 552, 97 L.Ed. 852 (1953).

16. We do not determine whether the Board is obligated to decide the issue. We hold only that it may do so with or without the consent of the General Counsel. See, Frito Company, Western Division, v.

We express no opinion on the issue. We do note, however, that one Court of Appeals reads N. L. R. B. v. Fleetwood Trailer Co., 389 U.S. 375, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967); N. L. R. B. v. Great Dane Trailers, 388 U.S. 26, 87 S. Ct. 1792, 18 L.Ed.2d 1027 (1967); American Ship Building Co. v. N. L. R. B., *supra;* and, N. L. R. B. v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965), as teaching that some lockouts may be violative of the Act without proof of antiunion animus. Lane v. N. L. R. B., 418 F.2d 1208 (D.C.Cir. 1969). The Court there said:

> "The Court, therefore, has established two categories of Sections 8(a) (1) and 8(a) (3) violations which do not require proof of antiunion animus. First, employer conduct which is 'inherently destructive' of employee rights is an unfair labor practice whether or not such conduct was based upon important business considerations. Second, employer conduct which has only a 'comparatively slight' impact on the rights of employees will also be held an unfair labor practice unless the employer comes forward with evidence of 'legitimate and substantial' reasons to justify his conduct. Perhaps the most significant part of this test is the Court's requirement that the reasons

advanced be substantial. Apparently the employer must demonstrate that his interest in pursuing the conduct at least balances the harm inflicted on the rights of the employees. Otherwise, the Court will find that an unfair labor practice has been made out with no proof of an antiunion motive. Only if the employer meets his burden will the Court require proof of an antiunion animus.

\* \* \* \* \* \*

> "Once the union has shown some adverse effect upon the rights of the employees, the employer must bear the burden of establishing the 'legitimate and substantial business justifications for his conduct.' "

*Id.,* at 1211.

On remand, it will be necessary for the Board to determine whether the interests of the employer-employees are to be balanced as suggested by *Lane;* and if so, the factors to be considered and the weight to be given to them in the balancing process.[17] If the Board decides that it is appropriate to balance the interests of the parties, it must then look both to the reduction in the work force and to the failure to follow established seniority procedures in achieving it.[18] This approach, used by the Su-

N. L. R. B., 330 F.2d 458 (9th Cir. 1964). See also, N. L. R. B. v. Dennison Mfg. Co., 419 F.2d 1080 (1st Cir. 1969); American Boiler Manufacturers Association v. N. L. R. B., 366 F.2d 815, 821 (8th Cir. 1966); Associated Home Builders of Greater East Bay, Inc. v. N. L. R. B., 352 F.2d 745 (9th Cir. 1965). Contra, International Union of Elec., Radio, etc. v. N. L. R. B., 110 U.S.App.D.C. 91, 289 F.2d 757 (1960).

17. We also note that law review commentary suggests that a balancing of employer-employees' interests is still necessary after *American Ship,* although more latitude is to be given to the parties in selecting their tactics. See Oberer, Lockouts and the Law: The Impact of American Ship Building and Brown Food, 51 Corn.L.Q. 193 (1966); Schatzki, The Employer's Unilateral Act—A Per Se

Violation—Sometimes, 44 Texas L.Rev. 470 (1966).

An alternative formulation of the necessary balancing process has been suggested in one of the commentaries:

"\* \* \* [I]t is open to the Board to find a violation *either* because the action of the employer which prejudices protected employee rights serves no significant legitimate interest of the employer *or* because, even where it does serve such an interest, it is so invasive of employee rights as to be inconsistent with the purposes of the labor statute." (Emphasis included.)

Oberer, *supra* at 214.

18. It may be that the necessary interests to be balanced have been brought out. The Trial Examiner found:

"Nothing has been shown here to establish that [a] period of almost two weeks

preme Court in N. L. R. B. v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963), retains its validity.[19]

We remand to the Board for action consistent with this opinion.

VAN OOSTERHOUT, Chief Judge (concurring in part and dissenting in part).

I concur in the majority opinion to the extent that it holds that Laclede's failure to bargain with the Union before locking out its employees was not violative of § 8(a) (5).

I find no basis for remand of the case to the Board. The briefs on the petition for review are directed entirely to the validity of the § 8(a) (5) holding. No issue is raised before us with respect to § 8(a) (1) or § 8(a) (3) violations. Questions not raised, briefed nor argued will ordinarily be given no consideration by an appellate court. Smith v. American Guild of Variety Artists, 8 Cir., 368 F.2d 511, 515, and cases there cited. Moreover, on the record before us, a remand would in my view serve no useful purpose.

I would reverse the Board's finding of a § 8(a) (5) violation and deny the Board's petition for enforcement.

was insufficient to allow the Company to lay off the personnel pursuant to departmental seniority. In this connection, I note the uncontradicted testimony that during vacation period, personnel are shifted from job to job within the department and in preparation for this very layoff, the Company consolidated construction crews to expedite the completion of jobs and progress."
However, we feel it proper for the Board to consider the matter and make the necessary determinations.

19. In N. L. R. B. v. Erie Resistor Corp., 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed. 2d 308 (1963), the employer sought to obtain replacements for striking employees; and in order to ensure that he could obtain replacements, he granted them twenty years of seniority. The Court, while reaffirming the right of an employer to obtain replacements for strikers, held that the granting of "super-seniority" was violative of §§ 8(a) (1) and (3). The Court stated:
"Because the employer's interest must be deemed to outweigh the damage to concerted activities caused by permanently replacing strikers does not mean it also outweighs the far greater encroachment resulting from super-seniority in addition to permanent replacement."
*Id.* at 232, 83 S.Ct. at 1147.