**INTER–COLLEGIATE PRESS, GRAPHIC ARTS DIVISION, etc.,**
**and**
**Sargent Welch Scientific Company, Petitioners,**
**v.**
**NATIONAL LABOR RELATIONS BOARD, Respondents.**

**BOOKBINDERS LOCAL NO. 60, INTERNATIONAL BROTHERHOOD OF BOOKBINDERS, AFL–CIO, Petitioner,**
**v.**
**NATIONAL LABOR RELATIONS BOARD, Respondent.**
**Nos. 72–1573, 72–1749.**

United States Court of Appeals, Eighth Circuit.
Submitted Sept. 10, 1973.
Decided Oct. 25, 1973.

Alvin D. Shapiro, Kansas City, Mo., for Intercollegiate Press.

William O. Eisler, Kansas City, Mo., for Bookbinders.

William DuRoss, III, Atty., NLRB, Washington, D. C., for National Labor Relations Board.

Before GIBSON and BRIGHT, Circuit Judges, and SMITH, Senior District Judge.[*]

GIBSON, Circuit Judge.

Does the use of temporary replacements during a bargaining lockout constitute a violation of §§ 8(a)(1) or 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 151 et seq.?[1]

The contending parties[2] are sharply divided on this issue. The Union has contended throughout these proceedings for a per se rule forbidding the hiring of temporary replacements during an otherwise lawful lockout, the Company has viewed the practice as a legitimate economic weapon countering the union's right to strike, and a divided Board (3–2) shunned the per se approach in favor of an approach balancing the conflicting legitimate interests of both the employer and employee.

The Company was charged with violations of §§ 8(a)(1) and (3) for continuing to operate with temporary employees after instituting an otherwise lawful

---

[*] The Honorable Talbot Smith, Senior District Judge, Eastern District of Michigan, sitting by designation.

[1.] This question was expressly left open by the Supreme Court in American Ship Bldg. v. N. L. R. B., 380 U.S. 300, 308 n. 8, 85 S.Ct. 955, 962, 13 L.Ed.2d 855 (1965):

"[W]e intimate no view whatever as to the consequences which would follow had the employer replaced its employees with permanent replacements or even temporary help."

[2.] Petitions for review of the order of the NLRB were filed by Inter-Collegiate Press, Graphic Arts Division-Sargent Welch Scientific Company and Sargent Welch (hereinafter referred to in the singular as Company) and the Bookbinders Local No. 60, International Brotherhood of Bookbinders, AFL–CIO. The Union's petition was originally filed in the 7th Circuit and transferred by that Court to the 8th Circuit. The petitions were consolidated by us for hearing. Jurisdiction is established under § 10(f) of the NLRA, as amended, 29 U.S.C. § ˙160(f). Briefs amicus curiae were filed by the Chamber of Commerce of the United States urging affirmance and the International Union urging reversal.

lockout. After a hearing, the administrative law judge concluded that he was bound by the Board's decision in Inland Trucking Co., 179 N.L.R.B. 350, 72 LRRM 1486 (1969), and found that the Company had violated the above sections by its use of temporary replacements. A majority of the Board disagreed and ordered the complaint dismissed. Inter-Collegiate Press, 199 N.L.R.B. No. 35 (1972).

While the Sixth Circuit has summarily dealt with this question and the Ninth Circuit referred to it in a different context, the Seventh Circuit is the only court that has previously articulated its views in passing upon this troublesome question. In Inland Trucking Co. v. N.L.R.B., 440 F.2d 562, 565 (7th Cir.), cert. denied, 404 U.S. 858, 92 S.Ct. 106, 30 L.Ed.2d 100 (1971),[3] the Seventh Circuit concluded:

> "[T]hat a lockout in the circumstances at bar, accompanied by continued operation with replacement labor, is per se, an interference with protected employee rights, and accordingly, per se, an unfair labor practice under § 158(a)(1)."

If we were to accept this analysis, little more would need be said, for the mere use of temporary replacements would constitute a violation of the Act. However, the Inland opinion is conditioned on the "circumstances at bar," and the parties read that decision more or less expansively according to their interest. Inland supports the Union's position, but we do not think it conforms with the Supreme Court's opinions touching this issue and decide it would be improper for us at this time to adopt a per se rule. To do so would remove the development of the law in this area

from the special competence of the Board, which has been proceeding on a case-by-case basis to adjudicate the impact of hiring temporary replacements during a lawful lockout by balancing the interests of employees and employers and thereby fashioning a national body of labor law under the broad Congressional guidelines set forth in the Act. Before placing this court's imprimatur on any per se rule, it would seem advisable to heed the admonitions of the Supreme Court in N.L.R.B. v. Erie Resistor Corp., 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963):

> "Here, as in other cases, we must recognize the Board's special function of applying the general provisions of the Act to the complexities of industrial life . . . and of '[appraising] carefully the interests of both sides of any labor-management controversy in the diverse circumstances of particular cases' from its special understanding of 'the actualities of industrial relations'. . . . 'The ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review.'" (citations omitted).

██ Our role as a reviewing court is to determine whether the Board's order is supported by substantial evidence on the record as a whole, Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), or has misapplied the law. N.L.R.B. v. Insurance Agents, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960). Here the Board

---

3. In Ottawa Silica Co., Inc. v. N. L. R. B., 482 F.2d 945 (6th Cir. 1973) the court entered an order enforcing the Board's order in Ottawa Silica Co., 197 N.L.R.B. No. 53, 80 LRRM 1404 (1972), wherein the Board found no violation of the Act in the use of temporary replacements during a lockout. In N. L. R. B. v. Golden State Bottling Co., 401 F.2d 454, 457 (9th Cir. 1965), the court in dicta stated:

> "The legal course open to [the employer] was to hire temporary replacements for the locked out employees. National Labor Relations Board v. Brown, 1965, 380 U.S. 278 [85 S.Ct. 980, 13 L.Ed.2d 839]."

Neither of these cases offer any discussion of the question and thus give little guidance in this case except to the extent they indicate a reluctance to adopt a per se rule as enunciated in Inland Trucking.

has chosen not to promulgate a *per se* rule, but rather to proceed on an individual case basis giving consideration to the special circumstances of each case. Admittedly, the conduct in question has some effect upon protected employee rights, but we are not prepared to say absolutely that a lockout plus the hiring of temporary replacements is conduct so "inherently destructive" of employee rights to warrant a reviewing court in promulgating a *per se* rule when the Board itself has chosen not to do so. To the extent that *Inland Trucking* is interpreted as setting forth a *per se* rule, it has been criticized by commentators,[4] and to follow that path would seem to ignore the caution raised in American Ship Bldg. v. N.L.R.B., 380 U.S. 300, 337–338, 85 S.Ct. 955, 977, 13 L.Ed.2d 855 (1965) (Goldberg, J., concurring), that "the problem of lockouts requires 'an evolutionary process,' not 'a quick, definitive formula,' for its answer." [5] It was also unnecessary to the decision reached in *Inland* to announce a *per se* rule, since the court went on to find a lack of any legitimate and substantial business justification for the employer's conduct, which would warrant a finding of a violation of the Act under the test of N.L.R.B. v. Great Dane Trailers, Inc., 388 U.S. 26, 34, 87 S.Ct. 1792, 18 L.Ed. 2d 1027 (1967).

Since we deem a *per se* approach inappropriate, we think it important to relate in some detail the facts of this case. The Company prints scholastic year books and graduation announcements at its plant in Mission, Kansas. The Union represents all the full-time and permanent seasonal employees in the cover and bindery departments, and those in the announcement department, who perform paper cutting, finishing, and packaging work.[6] In February, 1967, the Union was recognized as the bargaining representative of the above employees. After seven months of negotiations in 1967 during which a two week strike occurred, agreement was reached between the Union and the Company on a collective bargaining contract that expired August 31, 1970.

Negotiations on a new contract began July 7, 1970.[7] Fourteen bargaining sessions were held after this date until the Company lockout October 16th. It is uncontroverted that the Company and the Union were at impasse in their negotiations by October 15th, for on that date a federal mediator stated that further bargaining would be "an exercise in futility." The Company locked out all employees represented by the Union on October 16th, after being informed that morning that the Company's last contract proposal was unacceptable and the Union had no proposals to make. The last proposal offered provisions somewhat better than those in the expired contract.

The Union had been made aware as early as September 16th that the Company was considering a lockout, but no progress was made on any of the unresolved issues from that date until the date of the lockout. The parties and the Board are in agreement that the lockout was entirely legal at its inception.[8] No

4. Note, Lockouts—Employers' Lockout with Temporary Replacements is an Unfair Labor Practice, 85 Harv.L.Rev. 680, 683–85 (1972); Note, An Offensive Lockout Accompanied by Continuous Operations with Temporary Replacement Labor is Per Se an Unfair Labor Practice, 50 Tex.L.Rev. 552, 556–58 (1972).

5. *See also* Lane v. N. L. R. B., 135 U.S. App.D.C. 372, 418 F.2d 1208, 1209–1210 (1969), which indicates that the Supreme Court has suggested a modification of the approach in this area towards a balancing of the competing interests of labor and management.

6. Other unions represent various other units of the Company's overall operations.

7. Dates hereafter are in 1970 unless otherwise indicated.

8. Lockouts have survived a tumultuous history. Prior to 1965 and the Supreme Court decisions in N. L. R. B. v. Brown, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965) and American Ship Bldg. v. N. L. R. B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965), the use of the lockout had been restricted by the Board to certain carefully defined circumstances. Lockouts to preserve the integrity of a multi-employer bargaining

claim has been made that there was any bad faith on the part of the employer at the time the lockout began. The lockout failed to bring about any fruitful negotiations or agreements and effected no change in the Union's bargaining position. A substantial backlog of work had accumulated in the areas manned by locked out employees, and a failure to resolve the impasse before the Company's busy season would have prevented the Company from meeting its delivery schedules. Competitors were contacting Inter-Collegiate's customers and informing them that there would be late deliveries because of the labor dispute, and these customers were threatening to take their business elsewhere unless the Company could guarantee timely delivery. During the time when the Company's busy season was approaching, the Company's salesmen were warning of a substantial loss of customers and good will unless the labor dispute was resolved.

Inter-Collegiate is engaged in a highly seasonal business. It prepares year-books and announcements that must be delivered around the time of school graduations in May and June. The Company guarantees delivery of year-books 10 weeks after the complete school's copy is received and delivery of announcements six weeks prior to graduation exercises. Because of this delivery schedule, the Company has a peak period between February and June of each year, when it operates at over 100% of its plant's capacity (by use of overtime) and adds approximately 300 seasonal employees to its permanent work force of 200. Approximately 66% of their year-book volume and 98% of their announcement volume is shipped during this busy season. Any disruption has serious consequences for the Company's ability to meet its guaranteed delivery schedules. During the previous busy season the Company had been struck by a different union, and this strike disrupted deliveries and caused the cancellation of some contracts. Many customers who did not cancel their contracts after the late de-

---

unit in the face of a "whipsaw" strike had first been found unlawful, see Continental Baking Co., 104 N.L.R.B. 99 (1953), enforcement denied, 221 F.2d 427 (8th Cir. 1955); the Board then changed its view and upheld lockouts in these circumstances as reasonable defensive measures. Buffalo Linen Supply Co., 109 N.L.R.B. 447 (1954), aff'd sub nom., N. L. R. B. v. Truck Drivers Local Union No. 449, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957). However, it was unwilling to extend its holding to allow the use of temporary replacements to continue operations on the part of non-struck employers even if the struck member of the multi-employer group was operating with replacements. Brown Food Store, 137 N.L. R.B. 73 (1962). The Supreme Court's decision in N. L. R. B. v. Brown, supra, reversed the Board and settled the propriety of the use of temporary replacements to continue operations in these circumstances.

In cases involving single employers, the Board had evolved a rule that lockouts were only justifiable to safeguard against unusual operational problems or hazards, or economic loss if there were reasonable grounds for believing that a strike was threatened or imminent. American Brake Shoe Co., 116 N.L.R.B. 820, enforcement denied, 244 F.2d 489 (7th Cir. 1957); Betts Cadillac

Olds, Inc., 96 N.L.R.B. 268 (1951); International Shoe Co., 93 N.L.R.B. 907 (1951).; Duluth Bottling Assoc., 48 N.L.R.B. 1335 (1943). The mere desire to support a legitimate bargaining position was not viewed as a sufficient justification for the use of a lockout. Quaker State Oil Refining Corp., 121 N.L.R.B. 334 (1958); American Ship Bldg., 142 N.L.R.B. 1362 (1963). The Supreme Court reversal of the Board's American Ship decision made clear that a lockout in support of a legitimate bargaining position, at least after impasse, is valid. See, Note, The Unanswered Questions of American Ship, 64 Mich.L.Rev. 910 (1966), which suggests a pre-impasse lockout would be unlawful; but see N. L. R. B. v. Dalton Brick & Tile Corp., 301 F.2d 886 (5th Cir. 1962); Lane v. N. L. R. B., 135 U.S.App.D.C. 372, 418 F.2d 1208 (1960), which upheld the use of a pre-impasse lockout in support of a legitimate bargaining position.

The foregoing brief survey of decisions prior to Brown and American Ship illustrates both the complexity of the problem of lockouts in cases presented to the Board and the courts, and the importance of the Brown and American Ship decisions in the analysis of the problem presented to us for decision.

liveries in 1970 had made it quite clear that they would do so if the situation recurred.

The Company believed, we feel with justification, that the Union's strategy was to continue negotiations, while working without a contract, into the busy season when a strike or threat of a strike would have left the Company with little choice but to meet the Union's demands. This had been the scenario for the other union's strike during the last busy season. The Company was justifiably concerned over the state of its business affairs in November, 1970, for it was necessary to begin production to reduce the backlog of work in preparation for its busy season and produce salesman's samples to aid in the solicitation of new business. If it ended the lockout, there was the very real possibility of a strike during the busy season when it would be too late to hire replacements; it being the Company's belief that at least two months would be required to train new employees for full production and that it could sustain substantial and permanent damage to its business if the Company failed to meet its delivery dates. The permanent loss of a number of its customers and consequent loss of good will appeared a likely possibility, since its business depended significantly on repetitive patronage.

The Company, therefore, on November 9th, offered to end the lockout if the Union would agree to a no-strike commitment for the coming busy season. The Union made a counter-proposal whereby it would agree to the no-strike commitment if the Company agreed to sign a contract acceptable to the Union by July 1, 1971. No agreement was reached by the parties. Thereafter, on November 23rd, the Company informed the Union that it would begin hiring temporary replacements unless a contract was signed or a no-strike commitment given by November 30. The Union and the employees were informed that the replacements were to be used only for the duration of the labor dispute, and in any event, their employment

would not continue past June 21, 1971. The Company did hire replacements beginning November 30, resumed full production December 1, and continued the lockout until June 1, 1971, at which time the Company offered to reinstate all the locked out employees.

The evidence clearly indicates that the employer's use of the temporary replacements was motivated only by legitimate and substantial business reasons. We have carefully scrutinized the record and can find no indication that the employer's actions were motivated by any animus or hostility towards the Union or were undertaken to discourage its employees from the exercise of their collective bargaining rights.

The Company's petition in No. 72–1573 requests us to reverse the Board's finding that the Union was not on strike after November 9, 1970, the date that the employer *conditionally* offered to end the lockout. We think the finding of the Board on this issue is supported by substantial evidence on the record as a whole, and it will not be disturbed. As the Board found in favor of Inter-Collegiate on the unfair labor practice issue, this contention is apparently advanced as a means whereby we could avoid adjudication of the temporary replacement question, for if the Union were on strike, subsequent hiring of temporary or permanent replacements would not be violative of the Act.

The Company offered to end the lockout if the Union would oblige with a no-strike pledge during the busy season. The Union countered with a proposal to do so contingent upon the Company agreeing to a contract acceptable by the Union by July 1, 1971. No agreement was reached. The locked out employees were willing since October 19th "to return to their employment on an unconditional basis." The Company's offer to end the lockout was not unconditional, and the Board's finding that the employees were not on strike is supported by substantial evidence on the whole record and must be affirmed by us.

We now turn to an analysis of the lockout with the delayed temporary replacement of employees as presented in No. 72–1749. We note first the argument of the Union that while a "defensive" lockout plus the hiring of temporary replacements may be upheld, *citing* N.L.R.B. v. Brown, 380 U.S. 278, 85 S. Ct. 980, 13 L.Ed.2d 839 (1965), an "offensive" lockout plus the hiring of temporary replacements is violative of §§ 8(a)(1) and (3) of the Act. We do not think a *pro forma* application of the labels "offensive" and "defensive" to a lockout assists in the analysis required to determine the legality of the conduct involved.[9] Board Chairman Miller in his concurrence in this case recognized the limited utility of using labels:

"I am somewhat unsure as to the circumstances under which [a] court would regard a lockout as 'offensive' or 'defensive.' In fact, I am less sure that any such general labels are of real assistance in carrying out the kind of analysis which the Supreme Court would have us undertake." 199 N.L.R.B. at ——.

Eschewing the use of labels "offensive" or "defensive", we think the legality of an employer's conduct in a lockout should be determined by principles set out by the Supreme Court in N.L.R.B. v. Great Dane Trailers, Inc., 388 U.S. at 34, 87 S.Ct. at 1798:

"First, if it can reasonably be concluded that the employer's discrimina-

tory conduct was 'inherently destructive' of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, if the adverse effect of the discriminatory conduct on employee rights is 'comparatively slight,' an antiunion motivation must be proved to sustain the charge *if* the employer has come forward with evidence of legitimate and substantial business justifications for the conduct. Thus, in either situation, once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to *some* extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him."

*Great Dane* involved a claimed § 8(a)(3) violation. However, N.L.R.B. v. Fleetwood Trailer Co., 389 U.S. 375, 380, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967), indicates that the above principles are applicable in determining whether a § 8(a)(1) violation exists as well. The complaint in this case charges violations of both § 8(a)(1) and § 8(a)(3).[10]

■ If the employer's conduct is deemed "inherently destructive," it will be a violation of the Act under the first test in *Great Dane*. The phrase "inher-

---

9. As was stated in Laclede Gas Co. v. N. L. R. B., 421 F.2d 610, 615 n. 11 (8th Cir. 1970):

"Characterizing a lockout as 'defensive' or 'offensive' is a difficult task at best.
    *    *    *    *    *
" 'Moreover, and more important, whatever the determination in a particular case might be, the fact remains that the defensive lockout has its primary significance as an attempt to improve the employer's bargain. If that proposition be conceded   *   *   *   it undermines the basic distinction which the Board has sought to maintain in the lockout context —that is, the distinction between   *   *   * [offensive and defensive lockouts]   *   *   *.' Meltzer, Lockouts Under the LRMA: New Shadows on an Old Terrain, 28 U.Chi.L.

Rev. 614, 621 (1961)." Here it is the company advancing the distinction now apparently disfavored by the Board.

10. Section 8(a) of the NLRA, 29 U.S.C. § 158(a) provides:
"158. Unfair labor practices
    "(a) It shall be an unfair labor practice for an employer—
    "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
    *    *    *    *    *
    "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization   .   .   .."

ently destructive" is not easily susceptible of precise definition. In Radio Officers' Union v. N.L.R.B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954), the permanent discharge of workers because of participation in collective action was viewed as "inherently destructive." Erie Resistor Corp. v. N.L.R.B., *supra*, found a super-seniority plan awarded to those working during a strike to be "inherently destructive." And dicta in American Ship Bldg. v. N.L.R.B., 380 U.S. at 309, 85 S.Ct. 955, indicates that the Supreme Court would regard the permanent discharge of union members and their replacement with workers possessing violent anti-union animus to be "inherently destructive." We should not attempt to complete a catalog of actions that might be regarded as "inherently destructive," but rather must determine whether the conduct in this case should be so viewed. One commentator suggests that "inherently destructive" conduct is that which creates visible and continuing obstacles to the future·exercise of employee rights.[11] The impact of a lockout, as recognized by another commentator, is more likely to be on the union's bargaining position than on the employees' allegiance to the union,. at least where there is a history of bargaining relations between the parties.[12]

■ There has been no showing that the Union's position as bargaining agent was jeopardized or that it has suffered any diminution in its capacity to effectively represent the employees in the bargaining unit. Although 15 employees did not return to work after the lockout ended, this was apparently because they had found other jobs. There is no indication that any of the union employees who did return has disavowed his union membership. The Board did not find

the conduct here to be "inherently destructive," and we are not inclined to disturb this finding under the circumstances of this case.

The considerations which motivated the Court in N.L.R.B. v. Brown, 380 U. S. at 288–289, 85 S.Ct. 980, to conclude that the use of temporary replacements had a "comparatively slight" effect on employee rights are present here. First, the replacements were expressly hired only for the duration of the labor dispute, and a definite date was given for their termination even if the dispute was not resolved. This was communicated to both the union and the employees. Second, at all times the option was available to the employees to return to work by simply agreeing to the employer's terms, which were better than those in the old contract. Third, the employer had already agreed to continue in effect the union-security clause from the old contract.[13] Thus, we conclude that the employer's conduct did not have "unavoidable consequences . . . which he must have intended," *Erie Resistor, supra,* 373 U.S. at 228, 83 S.Ct. at 1145, and therefore was not "inherently destructive."

■■ Conduct having even a "comparatively slight" impact on employee rights may be a violation of § 8(a)(3), unless the employer has established a legitimate and substantial business justification. *Great Dane, supra,* 388 U.S. at 34, 87 S.Ct. 1792. Here the employer has established a legitimate and substantial business justification for his conduct, and there is no evidence of any unlawful motivation. We therefore agree with the Board that no § 8(a)(3) violation has been proved.

The Union argues that the conduct here is violative of § 8(a)(1) because of

---

11. Note, 85 Harv.L.Rev., *supra* at 686.

12. Getman, Section 8(a)(3) of the NLRA and the Effort to Insulate Free Employee Choice, 32 U.Chi.L.Rev. 735, 751 (1951).

13. Although the effective date would be deferred until Kansas law approved of such

agreements, this indicates to some extent the employer's recognition of the union as an economic fact of life and further supports the conclusion that no anti-union animus was present here.

the coercion inherent when the employees are deprived of their income while the company continues to operate. This consideration was of importance to the court in *Inland Trucking*:

"Such lockout forecloses the employees' opportunity to earn without surrendering the corresponding opportunity of the employer. It would not merely pit the employer's ability to withstand a shutdown of its business against the employees' ability to endure the cessation of their jobs, but would permit the employer to impose on his employees the pressure of being out of work while obtaining for himself the returns of continued operation."

440 F.2d at 564.

■ We recognize that there is coercion present when the employer locks out his employees, and it may be magnified when the employer continues operations with temporary employees.[14] The coercion, however, is to force acceptance of the employer's bargaining proposals, not to deter employees from the exercise of their rights. As recognized in *American Ship Bldg., supra,* 380 U.S. at 309, 85 S.Ct. at 962:

"Proper analysis of the problem demands that the simple intention to support the employer's bargaining position as to compensation and the like be distinguished from a hostility to the process of collective bargaining which could suffice to render a lockout unlawful."

■ It must be conceded that the use of a lockout in support of a legitimate bargaining position is not inconsistent with the right to bargain collectively or the right to strike. *American Ship Bldg., supra* at 310, 85 S.Ct. 955. The hiring of temporary replacements does no more than increase the pressure upon the employees to settle the dispute, while perhaps easing the pressure on the employer. Such pressure is surely no greater than that caused by stockpiling and subcontracting, *American Ship Bldg., supra* at 316, 85 S.Ct. 955, or the shifting of production to other plants during the lockout, Ruberoid Corp., 167 N.L.R.B. 987 (1967), which have been found lawful during a bargaining lockout.

"[T]he use of economic pressure by the parties to a labor dispute is not a grudging exception to some policy of completely academic discussion enjoined by the Act; it is part and parcel of the process of collective bargaining. . . . Surely it cannot be said that the only economic weapons consistent with good-faith bargaining are those which minimize the pressure on the other party or maximize the disadvantage to the party using them."

N.L.R.B. v. Insurance Agents, 361 U.S. at 495–496, 80 S.Ct. at 430–431.

The Chamber of Commerce of the United States in an *amicus curiae* brief filed in this case argues that a lockout is the corollary of the union's right to strike, *citing* Morand Bros. Beverage Co. v. N.L.R.B., 190 F.2d 576, 582 (7th Cir. 1953). A lockout could be viewed as the employer's ultimate economic weapon akin to the worker's right to strike, but this proposition, even if correct, does not

---

14. We note in passing that the returns of continued operation with temporary employees may not be such as to lead most employers to take such a step. There was evidence in this case that Inter-Collegiate lost approximately $120,000 as a direct result of using temporary employees. In addition, replacements for highly skilled jobs may be hard to locate, or the cost of training replacements merely for the duration of a la-

bor dispute may be prohibitively high. In view of the above and the fact that the employer will have to prove legitimate and substantial business justification for his conduct, it is unlikely an employer would hire temporary replacements during an otherwise lawful lockout unless motivated by business exigencies. *See* Note, 50 Tex.L.Rev., *supra* at 555; Note, 85 Harv.L.Rev., *supra* at 684.

determine the question of the permissible scope of the lockout. The Supreme Court in N.L.R.B. v. Truck Drivers Local Union No. 449, 353 U.S. 87, 93 n. 19, 77 S.Ct. 643, 1 L.Ed.2d 676 (1957), in determining whether a lockout was permissible, found it unnecessary to pass upon whether the lockout is the corollary of the union's right to strike. In *American Ship Bldg., supra,* 380 U.S. at 315, 85 S.Ct. 955, in finding a bargaining lockout permissible, the Court indicated that the permissible scope of a lockout is a question ultimately resolved by an analysis of §§ 8(a)(1) and (3).

Neither the Board nor the courts should sit as arbiters of the permissible economic weapons available to the parties in a labor dispute. Instead, the Board's function in carrying out the policy of the Act must be to determine whether the conduct engaged in violates any provision of the Act. Here, since no anti-union animus or hostile motivation has been shown and the employer has established a legitimate and substantial business justification, we agree with the Board that there is no § 8(a)(1) violation merely because the Company may have increased the economic pressure on the Union by continued operation with temporary replacements. To find otherwise would be taking upon ourselves a general authority to assess the bargaining power of the parties to a dispute and to attempt to redress what we might perceive to be a relative imbalance in bargaining power by finding a violation of § 8(a)(1). Such a method of decision has been denied even to the Board. *American Ship Bldg.,* 380 U.S. at 317, 85 S.Ct. 955. The balancing of bargaining power denied to the Board must be contrasted with the Board's authority to balance "conflicting legitimate interests." *Erie Resistor, supra,* 373 U.S. at 236, 83 S.Ct. 1139. This is what the Board has done in this case.

Finding no violation of §§ 8(a)(1) or (3) in the facts of this case, we affirm the Board's dismissal of the complaint.