533 F.2d 1030
 92 L.R.R.M. (BNA) 2013, 78 Lab.Cas. P 11,369
 ROYAL TYPEWRITER COMPANY, a Division of Litton Business
Systems, Inc., a Subsidiary of Litton Industries,
Inc., and Litton Business Systems, Inc.,
a Subsidiary of Litton
Industries, Inc., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Allied Industrial Workers of America, Local 469, Affiliated
with International Union, Allied Industrial
Workers of America, AFL-CIO, Intervenor.
ALLIED INDUSTRIAL WORKERS OF AMERICA, LOCAL 469, affiliated
with International Union, Allied Industrial
Workers of America, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
LITTON INDUSTRIES, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Allied Industrial Workers of America, Local 469, affiliated
with International Union, Allied Industrial
Workers of America, AFL-CIO, Intervenor.
 Nos. 74-1250, 74-1292 and 74-1301.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 7, 1975.
Decided March 31, 1976.
Rehearing and Rehearing En Banc Denied April 29, 1976.
 
 Ransom A. Ellis, Jr., Springfield, Mo., for Royal Typewriter Co.; L. W. Hannah and Paul W. Ring, Springfield, Mo., on briefs.
 Kenneth R. Loebel, Milwaukee, Wis., for Allied Industrial Workers of America; Goldberg, Previant & Uelman, Milwaukee, Wis., on briefs.
 M. J. Diederich, Beverly Hills, Cal., for Litton Industries, Inc.
 David Fleischer, Atty., N. L. R. B., Washington, D. C., for N. L. R. B.; Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Robert Giannasi, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., on briefs.
 Myron G. Hill, Jr., Washington, D. C., on brief for National Assn. of Manufacturers, amicus curiae.
 Milton A. Smith, Gen. Counsel, Richard Berman, Labor Relations Counsel, Chamber of Commerce of the U. S., Washington, D. C., Gerard C. Smetana, Lawrence M. Cohen and Christopher L. Williams, Chicago, Ill., on brief for Chamber of Commerce of the U. S., amicus curiae.
 Before JOHNSEN, Senior Circuit Judge,* STEPHENSON and WEBSTER, Circuit Judges.
 WEBSTER, Circuit Judge.
 
 
 1
 In an unfair labor practice proceeding before the National Labor Relations Board, petitioners Litton Industries, Inc. (Litton) and two of its affiliates, Royal Typewriter Co. (Royal) and Litton Business Systems, Inc. (LBS), were found to have committed certain unfair labor practices in connection with contract negotiations at Royal's Springfield, Missouri, plant. Petitioners seek review. Intervenor Allied Industrial Workers of America, Local 469 (the "Union") has filed a cross-petition for review complaining of the Board's failure to find petitioners guilty of other unfair labor practices and in refusing back pay and other money damages. The Board filed a separate application for enforcement of its order.[1] A significant question presented is whether the Board erred in finding that Litton and its affiliates Royal and LBS were a single employer for purposes of assessing liability for such unfair labor practices and in fashioning appropriate relief. Litton also contends that it was denied procedural due process in the administrative proceedings. We enforce the Board's order.
 
 
 2
 We turn first to the historical facts, which are undisputed.
 
 
 3
 The controversy arises out of a complex and extended labor dispute at the Springfield, Missouri, production facility of Royal, a division of LBS,[2] where portable manual and electric typewriters were manufactured. The trouble began in December, 1968, when Royal's contract with the Allied Industrial Workers of America, Local 469, which had been executed in 1966 following certification of the Union as the bargaining representative of the production and maintenance employees at the Springfield plant, was about to expire and the Union sought to begin negotiations toward a new contract. Instead of negotiating, Royal notified the Union of its intention to terminate the contract when it expired on February 21, 1969, since Royal claimed to have a bona fide doubt that the Union no longer represented a majority of its employees.
 
 
 4
 On January 30, 1969, the Union filed a charge with the Board alleging that Royal's refusal to bargain constituted an unfair labor practice. Thereafter, following several meetings around February 20 and 21, 1969, the parties began preliminary contract talks. A proposal by Royal that a strike be avoided was rejected by the Union, and at midnight on February 21, 1969, without even an agreement to bargain having been reached, some 900 of Royal's approximately 1100 workers went on strike. Shortly before the strike, Mark Jurras, the Springfield plant manager, had addressed the employees, urging them not to strike and making various promises, including a wage increase.
 
 
 5
 On February 25, 1969, the Board's General Counsel issued a complaint against Royal Typewriter Co., charging that its refusal to bargain violated Sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5). Unconditional bargaining between Royal and the Union finally began on March 24, 1969.[3]
 
 
 6
 On March 28, 1969, Royal informed the Union that it had to resume production of portable electric typewriters and was considering doing it elsewhere, a transfer which would be permanent. The Union replied that if such a decision were made it would want to discuss severance pay and other benefits. On April 2, 1969, Royal announced it would transfer the production of portable electric typewriters to its main typewriter plant at Hartford, Connecticut, a move that would eliminate approximately 350 jobs in Springfield. The Union asserted that this action was unlawful and demanded the right to bargain about the decision.
 
 
 7
 On April 15, Royal announced that a permanent closing of the entire Springfield plant was being considered.[4] The parties continued bargaining, apparently under the impression that a new contract might save the plant, but no agreement was reached. On April 23, 1969, Royal announced that the Springfield plant would be closed.
 
 
 8
 Thereafter, all bargaining concerned the rights of the employees following the closedown of the plant: vacation pay, severance pay, and employees' rights to preferential hiring at other Litton plants in Springfield or other locations. No agreement was ever reached between Royal and the Union, however, and they did not meet after October 7, 1970.
 
 
 9
 In May, 1969, certain Springfield employees were rehired by Royal at an increased rate of compensation to help with the plant closedown and do repair and refurbishing work. On July 8, 1970, Royal offered work to its former Springfield employees at its Hartford typewriter plant without notifying or consulting the Union.
 
 
 10
 On the basis of the foregoing facts, the Board's General Counsel filed an unfair labor practice complaint against Royal and LBS. The companies denied all charges. Following a lengthy hearing, the Administrative Law Judge found, in an opinion dated August 19, 1971, that Royal and LBS were a single employer for purposes of the action. He also concluded: (1) that the threat to close the plant in the event of a strike and the promise of a wage increase to nonstriking workers given in the speech to the employees by Jurras violated Section 8(a)(1) of the Act; (2) that Royal's refusal to bargain unconditionally between December 18, 1968, and March 19, 1969, violated Sections 8(a)(1) and (5) of the Act; (3) that Royal was not required by the Act to bargain about its decision to close its Springfield plant; and (4) that Royal violated Sections 8(a)(1) and (5) of the Act by granting temporary work and offering reinstatement to employees without notice to or consultation with the Union.
 
 
 11
 On February 14, 1973, the Board granted the General Counsel's motion to add Litton Industries, Inc., as a respondent and remanded the case for further hearings on the issue of whether Litton, Royal, and LBS were a single employer, and for the receipt of other evidence concerning Litton's participation in any unfair labor practices. The Administrative Law Judge ruled in favor of Litton on both issues.
 
 
 12
 On review, the Board generally agreed with the findings of the Administrative Law Judge, but modified his findings in three important respects, ruling (1) that Litton, Royal, and LBS did constitute a single employer, with Litton Industries therefore participating in the unfair labor practices found in the case; (2) that the companies did have a duty to bargain in good faith with respect to the decision to close the Springfield plant and that they had failed to fulfill this duty; and (3) that the companies did not bargain in good faith with respect to the effects of the closing on the bargaining unit employees. As the remedy, the Board issued a cease and desist order and further ordered preferential hiring procedures at Litton typewriter plants as well as other Litton plants in and around Springfield for former Springfield typewriter workers, and good faith bargaining with the Union on the effects of the closing of the Springfield plant. The Board declined to order the companies to provide backpay and other miscellaneous money damages as it had been requested to do by the Union.[5]
 
 
 13
 Royal (No. 74-1250), Litton Industries (No. 74-1301), and the Union (No. 74-1292) all seek review of this order.
 
 
 14
 Our review under Section 10(e) and (f) of the National Labor Relations Act, 29 U.S.C. § 160(e) and (f), is circumscribed by the direction that "(t)he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole[6] shall be conclusive." 29 U.S.C. § 160(e). See Universal Camera Corp. v. NLRB, 340 U.S. 474, 487-88, 71 S.Ct. 456, 464, 95 L.Ed. 456, 467 (1951). The remedy selected by the Board may be set aside "only upon a showing of abuse of its broad discretion in its field of specialization." NLRB v. Drapery Manufacturing Co., 425 F.2d 1026, 1029 (8th Cir. 1970), and its order "should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Id. at 1028, quoting Virginia Electric & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568, 1574 (1943).
 
 
 15
 * UNFAIR LABOR PRACTICES
 
 A.
 
 16
 The Board found that Royal's refusal to bargain unconditionally from December 18, 1968, to February 21, 1969, was a violation of Sections 8(a)(1) and (5) of the Act, in that Royal lacked objective grounds for doubting that the Union enjoyed majority representative status; and that from February 21 until March 19, 1969, Royal imposed unlawful conditions upon its offer to bargain with the Union, thereby further violating Sections 8(a)(1) and (5).
 
 
 17
 The Union was certified as the collective bargaining representative of Royal's employees on February 18, 1966. Later that year, Royal and the Union entered into a collective bargaining agreement which was to expire February 21, 1969. On December 18, 1968, after the Union had contacted Royal about bargaining for a new agreement, Royal refused to negotiate with the Union, stating that it had a bona fide doubt as to whether the Union represented a majority of its employees. Royal based this refusal on (1) the existence of a "Free Choice Committee" at the Springfield plant, which represented that it had filed a motion with the Board to revoke the "union shop" power of the Union at Springfield; and (2) a letter from a local attorney stating that a large number of Royal's employees retained him to advise the company of their informed belief that the Union no longer represented a majority of the employees at the plant and that if Royal negotiated with the Union, the employees would "take appropriate legal action to stop such illegal recognition of the Union which has lost its majority support among the employees in the bargaining unit."
 
 
 18
 The Administrative Law Judge rejected these reasons as a basis for a bona fide doubt of the continuing majority status of the Union, primarily because "(i)t would put the right to bargain and the certification of a representative in serious jeopardy if that right could be denied merely on an employer's belief that his employees were dissatisfied with their union." The Board adopted this conclusion reiterating that "objective grounds" were required before a Union's majority status could be doubted.
 
 
 19
 On review, Royal asserts fourteen "objective facts" as the basis for its alleged bona fide doubt.[7] We think the filing of a deauthorization petition, signed by over 30 per cent of the members of the bargaining unit, when taken cumulatively with other objective facts casting doubt upon the Union's majority status, forms a more than adequate basis for Royal's bona fide doubt and hence, as to this point, the Board's finding lacks substantial evidentiary support in the record for the period prior to February 9, 1969.
 
 
 20
 All of the objective facts relied upon in this review were at the time in question known to Royal. See Terrell Machine Co. v. NLRB, 427 F.2d 1088 (4th Cir.), cert. denied, 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91 (1970). We have held that the filing of a decertification petition supported by a requisite 30 per cent showing of interest "alone would justify an employer in declining to bargain further with the bargaining representative pending disposition of the decertification request" unless the loss of majority status was attributable to the employer's own unfair labor practices. National Cash Register Co. v. NLRB, 494 F.2d 189, 194 (8th Cir. 1974). No such conduct has been established with respect to the period prior to December 18, 1968. The tenuous posture of the Union's status as bargaining representative from its first appearance at the Springfield plant, coupled with strong evidence of deterioration of its standing such as reduced numbers of authorized dues check-offs, higher employee turnover, and reduction in union membership, gave credence to the deauthorization petition and supplied the "rational basis in fact" which cast a "serious doubt" upon the Union's majority status. See Komatz Construction, Inc. v. NLRB, 458 F.2d 317, 326 (8th Cir. 1972), quoting NLRB v. Frick Co., 423 F.2d 1327, 1331 (3d Cir. 1970).
 
 
 21
 On February 9, 1969, the Springfield plant employees authorized a strike by a vote of 535 to 88 out of the 1091 employees entitled to vote. Royal was informed of this vote. On February 21, 1969, approximately 900 employees went on strike. At this point, whatever rational basis in fact may have existed for Royal to doubt the majority status of the Union must certainly have evaporated. As the Fourth Circuit recognized in NLRB v. Preston Feed Corp., 309 F.2d 346, 351 (4th Cir. 1962):
 
 
 22
 (I)t (is) a little short of absurd for an employer to express a doubt as to the representative status of a union when the majority of the employees (have) gone on strike under its guidance.
 
 
 23
 At the initiation of the strike, however, Royal made only a limited offer of negotiation. It offered to bargain with the Union if the Union first agreed to withdraw the unfair labor practice charge it had filed with the Board when Royal first refused to bargain and if the Union agreed to extend the contract for sixty days. Unconditional bargaining did not begin until almost a month later. Such imposition of unlawful conditions on bargaining clearly violated Sections 8(a)(1) and (5) of the Act. See Lion Oil Co. v. NLRB, 245 F.2d 376, 379 (8th Cir. 1957); NLRB v. Jones Furniture Manufacturing Co.,200 F.2d 774, 775 (8th Cir. 1953).
 
 
 24
 Upon review Royal does not undertake to explain its reasons for imposing such conditions, and since they occurred at a time when Royal could no longer have entertained a good faith doubt as to the Union's majority status, we affirm the Board's finding that such conditions were in violation of Sections 8(a)(1) and (5) of the Act.
 
 B.
 
 25
 The Board found that the speech to employees by Mark Jurras, manager of the Springfield plant, on February 7, 1969, contained threats and promises of benefit in violation of Section 8(a)(1) of the Act. Our examination of the text of those remarks convinces us that there was a substantial basis on the record for the Board's finding. In his speech, Jurras made clear threats to terminate production of typewriters at Springfield. He said:
 
 
 26
 The decision of where and when to operate will be made by the company. The company is prepared if need be to produce typewriters elsewhere. Litton has typewriter plants at its disposal in Germany, Japan, Holland, England, Hartford and in the Monroe system also here in the United States. The product line will not suffer and we will not permit a loss of service to our customers because of a work interruption in Springfield, Mo. Many of you will recall statements made by Mr. Kenneth Berg right here in this cafeteria during one of the union organization campaigns when he said that one of the principle (sic) reasons that we were making typewriters in Springfield instead of in Hartford was because of union difficulties in Hartford. It appears that the union officials who are now seeking your strike authorization have either forgotten this fact or they choose to ignore it, thinking that lightning won't strike twice in the same place.
 
 
 27
 Such language was not in the nature of a statement of objective fact in order "to convey (the) employer's belief as to demonstrably probable consequences beyond his control", NLRB v. Gissel Packing Co., 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547, 580 (1969); instead, it conveyed the clear intention of the management to make a unilateral decision unrelated to economic necessities which could include closing the plant and/or transferring operations to another area. The statements are as readily susceptible of interpretation as coercive threats as they are of honest forecasts, and since the Board's conclusion is reasonable, there is no basis for our reaching a different inference or conclusion. See NLRB v. Saunders Leasing System, Inc., 497 F.2d 453, 458 (8th Cir. 1974); NLRB v. Louisiana Manufacturing Co., 374 F.2d 696, 703 (8th Cir. 1967). We must view the remarks in the context in which they were delivered. NLRB v. Frontier Homes Corp., 371 F.2d 974, 977 (8th Cir. 1967). The tensions at play between the employer, the Union, and the employees at the time of the talk only reinforce the reasonableness of the Board's conclusion.
 
 
 28
 Jurras's speech also contained a promise of benefit. He stated:
 
 
 29
 As I said before, it is obviously going to be quite a while before we know exactly where we stand on the question of whether we can or cannot legally bargain with the union. As we said before that we did not want to see our employees penalized by this problem, accordingly, regardless of whether there is a strike or not, it is our intention to place a substantial wage increase into effect on February 22. This is not being done to try to get you to reject the union. It is simply facing the facts of life. We know that you have not had an increase in wages for almost 15 months under the union contract. You are entitled to an increase now with or without a union and there is no telling how long the union may drag this thing on. Therefore, we are going to keep our promise to you that you are not going to have to wait another 6 or 12 months to get a wage increase. On February 22 an increase will be made effective.
 
 
 30
 The promised wage increase did not take place until April 17, 1969. The statement made in the context of encouraging rank and file support of Royal against the Union was clearly a promise of benefit unprotected by Section 8(c) of the Act.[8]
 
 
 31
 The Union contends that the Board erred in failing to find a separate Section 8(a)(1) violation in three speeches made on February 21, 1969, by Ransom Ellis, Royal's attorney, to the Springfield employees. The Administrative Law Judge made no credibility findings and from our review of the text of the speeches basically a report on what Ellis had told the Union during negotiations we find the Board's decision to reject this contention to be supported by the record. Cf. NLRB v. Arkansas Grain Corp., 392 F.2d 161, 165-66 (8th Cir. 1968). See generally NLRB v. Gissel Packing Co., supra, 395 U.S. at 617, 89 S.Ct. at 1941, 23 L.Ed.2d at 580.
 
 C.
 
 32
 The Administrative Law Judge recognized, and the Board appears not to contest, that the decision to close the Springfield plant was motivated by economic considerations.[9] Contrary to the Administrative Law Judge, however, the Board found that the decision to close the plant was a mandatory subject of bargaining and that failure to bargain was thus a violation of Section 8(a)(1) and (5) of the Act. In view of the passage of time since the plant's closing, however, the Board ordered no remedial relief with respect to this finding. We therefore find it unnecessary to discuss this finding except to make clear that we do not adopt the Board's view, which it has continued to press since its holding in Ozark Trailers, Inc., 161 NLRB 561, 564-70 (1966), that an employer operating two or more plants is obligated to bargain with respect to a decision to close one of those plants. We squarely rejected that holding in NLRB v. Drapery Manufacturing Co., supra,425 F.2d at 1027-28, and reaffirmed our adherence to the view set forth in NLRB v. Adams Dairy, Inc., 350 F.2d 108, 110-13 (8th Cir. 1965), cert. denied, 382 U.S. 1011, 86 S.Ct. 619, 15 L.Ed.2d 526 (1966), that, absent union animus, a company has no legal duty to bargain with a union over the decision to partially shut down its operations because of economic reasons. See also Morrison Cafeterias Consolidated, Inc. v. NLRB, 431 F.2d 254, 257 (8th Cir. 1970).[10]
 
 
 33
 The Board also found that Royal unlawfully refused to bargain in good faith with the Union with respect to the effects of the plant closing. Royal contends that it did in fact bargain with the Union over a wide range of subjects which could reasonably be described as the "effects" of closing. These included pro rata vacation pay, vested pension rights, severance pay, preferential hiring in Springfield, refunds on savings bonds, employer recommendations, continued insurance coverage, apprenticeship certificates, tool purchases, establishment of dates for unemployment eligibility, performance of bargaining unit work, possible dismissal of pending litigation, and disposition of pending arbitration cases. Royal contends that the Board improperly relied upon individual circumstances rather than the totality of conduct in finding that Royal was guilty of bad faith bargaining. See NLRB v. Almeida Bus Lines, Inc., 333 F.2d 729, 731 (1st Cir. 1964).
 
 
 34
 We think it is now settled in this Circuit that an employer, although under no duty to bargain regarding his decision to close a plant, must nonetheless, consistent with the rights of employees to be represented in areas of wages and terms and conditions of employment, bargain with the Union in good faith over those areas which are affected by such decision. Morrison Cafeterias Consolidated, Inc. v. NLRB, supra, 431 F.2d at 257.
 
 
 35
 The record substantiates Royal's claim that it did in fact bargain over numerous "effects" of the decision to close the Springfield plant. The Board contends, however, that this bargaining was tainted by actions taken by Royal during the period following the announcement of the decision to close. We discuss these actions seriatim.
 
 
 36
 1. Royal recalled certain employees to work at the Springfield plant repairing and refurbishing typewriters at a pay scale higher than Royal had ever offered to the Union. The Union had been told that only close-out work would be performed at Springfield, and had agreed to waive its right to bargain only as to such work. Royal then asked the Union to waive its right to bargain for employees performing "unit" work. We think the Board had a reasonable basis for concluding that this unilateral activity by Royal in an area still committed to collective bargaining and in a manner subversive of the employees' right to be represented was strong evidence of bad faith.
 
 
 37
 2. A second example of subversion of the bargaining process occurred when Royal offered temporary and permanent employment at its Hartford plant to some of its recalled employees and offered them moving and travel expenses. In its prior dealing with the Union, Royal had demanded that employees accept transfer on short notice and without moving or travel expenses.
 
 
 38
 3. On July 8, 1970, a similar offer was made to all former Springfield employees for transfer to Hartford, West Hartford, or Newington, Connecticut, with moving and relocation expenses to be paid by Royal. While the Union was subsequently consulted, it had in fact been bypassed. Such conduct is "necessarily inconsistent with a sincere desire to conclude an agreement with the union" on the effects of termination. See NLRB v. Katz, 369 U.S. 736, 745, 82 S.Ct. 1107, 1113, 8 L.Ed.2d 230, 237 (1962). This course of conduct, of negotiating with respect to a termination agreement on the one hand and making offers to the employees which had not been referred to the Union on the other, extended at least from April 30, 1969, until July 8, 1970. Demanding waivers from the Union produced some degree of obdurateness in response, but this did not explain or warrant Royal's bypass of the employees' bargaining representative. The Board so found, and its finding is supported by the record. See NLRB v. Royal Plating and Polishing Co., 350 F.2d 191, 196 (3d Cir. 1965).
 
 D.
 
 39
 In its petition for review, the Union seeks to reopen the proceedings to entertain its charges that Royal's transfer of the portable electric typewriter production from Springfield to Hartford, Connecticut, was a discriminatory act in regard to hire or tenure of employment and hence an unfair labor practice under Section 8(a)(3) of the Act. The General Counsel's complaint did not identify such a violation and the Board did not reach the issue, although the Union's charges which preceded the issuance of the complaint had arguably raised the issue. The Union contends that Royal seized upon an unfair labor practice strike as an excuse to move the portable electric line from Springfield and thereby terminate the employment of 350 workers.
 
 
 40
 It is the general rule that discretion to frame the issues in an unfair labor practice case rests in the General Counsel, who occupies a role not unlike that of a prosecutor. See Kellwood Co., Ottenheimer Bros. Mfg. Div. v. NLRB, 411 F.2d 493, 499-500 (8th Cir. 1969). That discretion "to refuse to institute an unfair labor practice complaint" has been described by the Supreme Court as "unreviewable". Vaca v. Sipes, 386 U.S. 171, 182, 87 S.Ct. 903, 913, 17 L.Ed.2d 842, 853 (1967), citing United Electrical Contractors Association v. Ordman, 366 F.2d 776 (2d Cir. 1966), cert. denied, 385 U.S. 1026, 87 S.Ct. 753, 17 L.Ed.2d 674 (1967). We have held that federal courts ordinarily do not have jurisdiction to review the General Counsel's exercise of his authority. See Braden v. Herman, 468 F.2d 592, 593 n. 2 (8th Cir. 1972), cert. denied, 411 U.S. 916, 93 S.Ct. 1546, 36 L.Ed.2d 308 (1973), and cases cited therein. But cf. NLRB v. IBEW, Local 357,445 F.2d 1015, 1016 n. 2 (9th Cir. 1971). Our holding in Laclede Gas Co. v. NLRB, 421 F.2d 610 (8th Cir. 1970), is not to the contrary. There, we simply held that the complaint was broad enough to encompass the issue and that the facts warranted further consideration under Sections 8(a)(1) and (3). Laclede Gas Co. v. NLRB, supra, 421 F.2d at 616-17. In this case, the complaint is not so broad as to admit of such an expanded construction, and the record makes clear that the transfer decision was brought about through a perilously low inventory which made production elsewhere under highly competitive circumstances an economic necessity. Moreover, at the time the decision was made it was anticipated that the affected employees would be used to work on the new line of German typewriters which Royal had planned to bring to Springfield. We do not think the circumstances of this case fall within the Laclede Gas Co. exception and we therefore decline to remand for reconsideration under Section 8(a)(3).
 
 II
 LITTON INDUSTRIES
 
 41
 Litton Industries separately petitions for review of the Board's holding that it, along with Litton Business Systems and Royal Typewriter Co., constituted a single employer for purposes of assessing responsibility for the unfair labor practices and of fashioning appropriate relief. Litton further contends that the manner by which it was added as a party late in the proceedings denied it due process of law. The procedural steps by which Litton was added as a party and thereafter assigned single employer status are set forth in detail in the margin.[11]
 
 A.
 
 42
 Litton is a large conglomerate with many wholly owned subsidiaries, including LBS. The board of directors and officers of LBS are drawn from the officers and executive committee of Litton. LBS has no real operational function of its own and was created primarily for tax purposes. Litton itself consists of four groups, each headed by a senior vice president. Each group is divided into several subgroups which operate one or more divisions headed by an executive appointed (and removed) by the group executive.
 
 
 43
 In 1967, the assets of Royal-McBee Corporation, which had been acquired by Litton in 1965, were merged into LBS. Five unincorporated divisions were formed from Royal-McBee under the control of one group, three of which were later combined to form the Royal Products Division, which included the Springfield and Hartford plants. During most of the period involved in this case, the president of Royal was the group executive and also a vice president of Litton.
 
 
 44
 While preserving a degree of operational autonomy within divisions, it is clear that Litton reserved to itself a role in major expenditures, budget control, acquisitions and plans, including any decision to close a plant. Litton, which itself employed only 400 of the approximately 118,000 employees within the conglomerate, made certain of the central services available to its subsidiaries and divisions. It provided a labor relations department, assistance and advice from which was available to any subsidiary or division. LBS had no labor relations personnel. Royal, which maintains its own pension plan, availed itself of the services provided by Litton's retirement planning department, and five members of the pension plan committee were officers of Litton or LBS. Royal maintained its own hospitalization and medical insurance plans.
 
 
 45
 The Administrative Law Judge concluded that Litton should not be classified as a single employer with LBS and Royal because:
 
 
 46
 1. Litton neither formulated nor administered any common or overall policy with respect to the labor relations of its subsidiaries.
 
 
 47
 2. Litton had no overall policy with respect to hiring, firing or other terms and conditions of employment of employees of subsidiaries.
 
 
 48
 3. Negotiations with labor organizations were conducted by the subsidiaries without intervention by Litton unless advice or counsel was requested.
 
 
 49
 4. Subsidiaries were free to conclude collective bargaining agreements without authorization from Litton.
 
 
 50
 5. Day-to-day labor problems, including the handling of grievances, were conducted at the plant level.
 
 
 51
 6. Subsidiaries were free to select their own counsel in labor relations or to seek advice from Litton's department of labor relations.
 
 
 52
 The Board disagreed, finding that all of the elements of a single employer relationship were present in the case: "common ownership, common management, actual control of the subsidiary's operations by the parent company, and centralized control over labor relations". See Broadcast Technicians, Local Union 1264 v. Broadcast Services of Mobile, Inc., 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789, 790 (1965); Marine Welding and Repair Works, Inc. v. NLRB, 439 F.2d 395, 397 (8th Cir. 1971).
 
 
 53
 In addition to the evidence of ownership and control over fundamental decision making processes previously discussed, the Board placed particular reliance upon the role of Litton in the labor negotiations and the decision to close the Springfield plant. The Board considered the patterns and practices of labor relations in other divisions of Litton in which management stressed the important role that Beverly Hills (Litton's home office) would play in labor contract decisions. It noted that Royal's plant manager Jurras had said during the 1966 contract negotiations that he would have to get approval for his final offer from Beverly Hills. It then observed that Royal's attorney Ellis made similar statements which were reinforced by the presence of Peter Irwin, Litton's director of labor relations, at bargaining sessions on April 8, 15, 21, 22, and 23, 1969. These included the sessions at which plans to close the Springfield plant were announced. Irwin commented on the economic reasons for the closing and also upon the Union's proposal. Irwin gave advice to Royal's negotiators and management with respect to the Union. On April 21, 1969, Irwin said that by 1:00 p.m. on April 23 "the meeting will have concluded in Beverly Hills and a decision reached." Ellis traded on this the next day by making a proposed termination agreement conditioned upon its acceptance by the Union "prior to the time that the Board of Directors makes a decision in Beverly Hills on the termination of this plant." The Board rejected Litton's contention that Robert Stewart, Royal's president, made the final decision to close the plant, finding that the significant fact was that the Royal negotiators clearly implied that Litton would make the decision.
 
 
 54
 We think these findings are well supported by the record.[12] By staffing the division offices with Litton officers and retaining control over all fundamental decisions, Litton had positioned itself to control the course of Royal's negotiations. In fact, Royal's negotiators capitalized on this element of subservience in an effort to induce the Union to accept Royal's proposed termination agreement. Moreover, the record adequately supports the Board's conclusion that the decision to shut down the Springfield plant, while ostensibly made by Royal's president, was in fact no more than the implementation by a Litton officer of a policy formulated in Beverly Hills as a result of considerations of broader scope than Royal's own operations.
 
 
 55
 In assessing the appropriateness of single employer treatment, the fact that day-to-day labor matters are handled at the local level is not controlling. See Darlington Manufacturing Co. v. NLRB, 397 F.2d 760, 765 (4th Cir. 1968), cert. denied, 393 U.S. 1023, 89 S.Ct. 632, 21 L.Ed.2d 567 (1969); Sakrete of Northern California, Inc. v. NLRB, 332 F.2d 902, 907 (9th Cir. 1964), cert. denied, 379 U.S. 961, 85 S.Ct. 649, 13 L.Ed.2d 556 (1965). A more critical test is whether the controlling company possessed the present and apparent means to exercise its clout in matters of labor negotiations by its divisions or subsidiaries and whether its course of conduct encouraged or permitted the local negotiators to so represent the situation to union negotiators for the purpose of achieving a tactical or strategic objective. The presence of Irwin when some of these representations were made gave additional credibility to the statements. We do not think that a conglomerate can act in negotiations as a single employer and then expect to avoid the consequences if unfair labor practice charges result from such conduct.
 
 B.
 
 56
 We come next to Litton's claim that its addition as a party to the unfair labor practice proceeding after all the evidence had been received denied it minimum due process.[13] While the General Counsel withdrew his motion to add Litton as a party in order to avoid the delay of an appeal to the Board, he made clear his intention to adduce proof on the single employer issue, and counsel for Litton was present during most of the presentation of such evidence. When the Board ultimately permitted the complaint to be amended on February 14, 1973, it remanded the case for a further hearing on (1) the single employer status of Litton, LBS, and Royal; (2) the participation, if any, of Litton officials in the alleged unfair labor practices; and (3) any other factors relevant to the appropriateness of requiring Litton to participate in any relief which might be ordered. On April 6, 1973, the Board entered a further order making clear its intent that:
 
 
 57
 Litton Industries, Inc. (shall have) the opportunity to litigate the single-employer issue, including the right to examine and cross-examine witnesses, object to evidence previously introduced, and introduce additional relevant testimony and evidence, before this issue is decided.
 
 
 58
 Litton did not avail itself of this opportunity at this reopened hearing and filed no briefs with the Administrative Law Judge or the Board.
 
 
 59
 While we express some concern about the procedure under which the General Counsel deferred his effort to obtain Board approval to amend this complaint, we cannot say in the circumstances presented here that Litton has demonstrated that degree of prejudice which would warrant relief from this Court. Due process, to be effective, must be accorded at a meaningful time and in a meaningful manner. Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62, 66 (1965). The passage of time can erode memories and make it difficult to produce witnesses, evidence, and otherwise to construct a defense. The period of delay in this case is grounds for careful and sympathetic scrutiny of Litton's claims of prejudice. The totality of the circumstances, however, demonstrates that any prejudice resulted from Litton's failure to avail itself of the opportunity to reopen the case, confront the witnesses who had testified previously, and offer additional evidence of its own. See NLRB v. Jordan Bus Co., 380 F.2d 219, 223 (10th Cir. 1967).
 
 
 60
 The Board points out that the single employer issue could have been reached in a supplemental contempt proceeding against LBS and Royal, see NLRB v. Ozark Hardwood Co., 282 F.2d 1, 4 (8th Cir. 1960), and that the opportunity to participate accorded Litton in this case afforded at least as much due process as such a supplemental proceeding would have provided. This may overstate the case somewhat, because evidence adduced before Litton was joined as a party formed the principal basis for the Board's findings. On the other hand, the Board authorized the issue of Litton's involvement to be fully reopened; Litton sought no continuance, but simply refused to participate. Litton's attorney had been present when the evidence on the single employer issue was presented. There was thus no real surprise and Litton's refusal to participate was with knowledge of the evidence in the record.
 
 
 61
 The record thus fails to demonstrate any prejudicial denial of due process.
 
 III
 THE REMEDY
 
 62
 We have carefully examined the Board's remedial order[14] and find it to be well within the range of appropriate relief for violations of Section 8(a)(1) and (5) established by substantial evidence.
 
 A.
 
 63
 The bargaining order is limited in scope. It requires, in addition to the customary cease and desist order, only that the companies bargain within the framework of existing conditions which resulted from economic realities. Thus, they are required to bargain only over the effects of the decision to close the plant. Reinstatement, an appropriate remedy for unfair labor practice strikes, see Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 216-17, 85 S.Ct. 398, 405-406, 13 L.Ed.2d 233, 241-242 (1964); Kellwood Co., Ottenheimer Div. v. NLRB, 434 F.2d 1069, 1075 (8th Cir. 1970), cert. denied, 401 U.S. 1009, 91 S.Ct. 1257, 28 L.Ed.2d 544 (1971), is required only with respect to the Springfield plant, and then only if it resumes production of typewriters. If this occurs, the companies are required to bargain, upon request, with the Union as the bargaining representative of the employees in the appropriate bargaining unit at the Springfield plant.[15] Similarly, employment is required to be offered as available in any of Royal's typewriter facilities in Hartford, West Hartford, and Newington, Connecticut, upon terms to be negotiated with the Union but in no event less favorable than the unilateral offers by Royal which were the subject of the unfair labor practice charges.
 
 
 64
 The Board has required Litton, as a result of its single employer status with Royal, to participate in the relief in order to restore the Union as much as possible to the bargaining strength which it had before Royal ceased to bargain in good faith. The Board exercised appropriate restraint in order to achieve this objective without unnecessarily expanding the bargaining area. Thus, it required Litton to offer employment as available on a preferential hiring list basis to qualified Royal employees at any of its controlled plants in the Springfield area.[16] We think this order is reasonable and appropriate. Litton is ordered to bargain with the Union with respect to "the mode of operation of the preferential hiring list and the terms and conditions under which the Royal employees may, if they desire, obtain employment at the other Litton plants." No permanent bargaining relationship is mandated by the order. Litton has not been unreasonably drawn into a permanent bargaining relationship nor has its part of the remedy been expanded outside the Springfield area.
 
 B.
 
 65
 The Union contends that the Board erred in failing to award back pay and vacation pay, to restore the pension plan, and to order reimbursement for strike benefits, union dues, legal expenses, and costs.
 
 
 66
 The Union seeks back pay beginning on April 23, 1969. The Board denied back pay since there had been no timely unconditional offer to return to work. The Board has almost unfettered discretion on this issue. NLRB v. Drapery Manufacturing Co., supra, 425 F.2d at 1028-29. In Drapery Manufacturing Co., the court upheld an order of the Board awarding back pay in a situation remarkably similar to the instant case. It must be noted, however, that the strike in that case had ended prior to the closing of the plant and the order was upheld only because of the Board's wide discretion. In Loren Service Co., Inc., 208 NLRB 763, 768 (1974), the Board, adopting the language of the administrative law judge, said that "(i)t is, of course, settled law that in order to obtain reinstatement following a strike, the strikers must make an unconditional application therefor within a reasonable time following the end of the strike." In the instant case, the Union waited almost three months. The strike ended a little over two weeks after the plant was closed.
 
 
 67
 Other monetary claims are likewise without merit. While a pension fund may survive the termination of a collective bargaining agreement, see Hinson v. NLRB, 428 F.2d 133 (8th Cir. 1970), there was no finding of violation of the Act with respect to the pension plan. Likewise, since the Union voluntarily failed to collect dues, the Board properly refused to order reimbursement. Food Stores Employees Union, Local 347 v. NLRB, 155 U.S.App.D.C. 101, 476 F.2d 546, 552-53 (1973), rev'd on other grounds, 417 U.S. 1, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974). The awarding of legal expenses and costs arising from NLRB litigation is within the discretion of the Board, and the Board will not be overruled unless the employer's litigation was so frivolous as to enable the reviewing court to find an abuse of discretion, a condition certainly not present here. Federal Prescription Service, Inc. v. NLRB, 496 F.2d 813, 819 (8th Cir.), cert. denied, 419 U.S. 1049, 95 S.Ct. 624, 42 L.Ed.2d 643 (1974). The Union cannot recover other amounts claimed as remedial relief under the Act absent a showing of extraordinary expenditures resulting from the companies' bad faith bargaining. Tiidee Products, Inc.,194 NLRB 1234, 1236 (1972), enforced as modified sub nom. International Union of Electrical Workers v. NLRB, 163 U.S.App.D.C. 347, 502 F.2d 349, 361 (1974), cert. denied, 421 U.S. 991, 95 S.Ct. 1997, 44 L.Ed.2d 481 (1975).
 
 
 68
 The Board's action with respect to the monetary claims was thus well within the range of its discretion.
 
 IV
 CONCLUSION
 
 69
 We hold the Board's findings, except as noted in parts I-A and I-C, supra, to be supported by substantial evidence on the whole record. Litton was not prejudicially denied due process in the unfair labor practice proceedings. The remedy is within the Board's discretion and will be enforced.[17]
 
 
 
 *
 The Honorable Harvey M. Johnsen, now deceased, participated in the conference and agreed to the disposition reflected in this opinion
 
 
 [1]
 The Board's order, which will subsequently be discussed in more detail with respect to the specific contentions of the parties, ordered the named companies to cease and desist from unfair labor practices. In addition, it ordered them (1) to bargain with the Union with respect to the effects of closing Royal's Springfield plant upon the unit employees and to embody any understanding reached in a signed agreement; (2) to offer reinstatement to the employees and to bargain with the Union as their representative in the event the Springfield plant should resume production of typewriters; (3) to offer employees employment as available at Royal's plants in Hartford, West Hartford, and Newington, Connecticut, and to pay moving expenses in an amount to be negotiated but not less than previously offered; and (4) to mail appropriate notices to the employees' last known addresses. Litton was additionally ordered to offer employment to Royal employees as available at any of its controlled facilities in the Springfield area, and to bargain with the Union as to the manner, terms, and conditions thereof
 
 
 [2]
 Royal Typewriter Co. is an unincorporated division of Litton Business Systems, which is a wholly owned subsidiary of Litton Industries, Inc. For convenience, Royal and LBS will be collectively described as "Royal" except as otherwise indicated
 
 
 [3]
 Between February 20 and March 19, 1969, Royal offered to begin negotiations with the Union if the Union agreed to certain conditions. The Board found this action to be an unfair labor practice
 
 
 [4]
 Litton Industries had planned to transfer to Springfield part of the production of Triumph-Adler, a German typewriter company it had acquired on January 3, 1969. This would supposedly make up for the transfer of the portable electric line to Connecticut. A Federal Trade Commission complaint alleging that the acquisition of Triumph-Adler violated Section 7 of the Clayton Act precluded this transfer. The FTC originally ruled against the acquisition, but recently reversed itself. Litton Industries, Inc., 3 CCH Trade Reg. Rptr. P 20,854 (March 4, 1975)
 
 
 [5]
 See note 1, supra
 
 
 [6]
 The record in this case consists of over 6200 pages in sixteen bound volumes
 
 
 [7]
 The fourteen grounds are summarized by Royal as follows:
 (1) Unions were defeated in five elections, including one runoff and one rerun, between 1959-1965;
 (2) The Union withdrew from one election;
 (3) The Union won representation by only 55% of the vote in 1966;
 (4) In 1968, petitions were circulated to oust the Union;
 (5) A schism developed in the Local Union, and International officials expressed fear that Teamsters would move in and ask Royal to help;
 (6) Membership meetings were sparsely attended and resignations from union office were frequent;
 (7) Royal was notified on May 22, 1968, that the "Free Choice Committee" sought to revoke the "union shop" clause;
 (8) Case No. 17-UD-19, filed October 2, 1968, requiring support by 30% of employees and election set for February 19, 1969;
 (9) On December 12, 1968, a Motion to Revoke Certification was filed, based on the failure of the Union to properly represent the membership;
 (10) On December 3, 1968, Royal was notified by employees' attorney that the majority of employees no longer desired representation, and legal action against Royal was threatened if bargaining occurred;
 (11) On December 6, 1968, sixteen employees advised Royal that the majority of employees no longer wanted representation; and Royal knew the Union had problems keeping membership together;
 (12) Five hundred new employees were hired since September, 1968, a turnover of approximately 50% of the work force;
 (13) Royal supervisors were advised that the Union did not represent the majority; and
 (14) The Union's Executive Board authorized the filing of a representation petition to determine its status.
 
 
 [8]
 Section 8(c) of the Act, 29 U.S.C. § 158(c), provides:
 The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice * * * if such expression contains no threat of reprisal or force or promise of benefit.
 See NLRB v. Arkansas Grain Corp., 392 F.2d 161, 165-66 (8th Cir. 1968).
 
 
 [9]
 This conclusion finds substantial support in the record. Following the accelerated transfer of the portable electric line to Hartford, Connecticut, the Springfield plant became unprofitable, a victim in large part of excess capacity and price deterioration on its remaining items. Litton's production of typewriters in Germany could not be transferred to Springfield because of antitrust problems raised by the Federal Trade Commission. See note 4, supra
 The Board conceded that the shutdown resulted from "pressing economic necessity", and no further detailing of the economic plight of the Springfield plant is required here.
 
 
 [10]
 We also reject the Board's alternative contention, raised on review, that Royal's initial offer to discuss this issue with the Union precluded a subsequent refusal to bargain further on the subject. See Taft Broadcasting Co., WDAF AM-FM-TV v. NLRB, 441 F.2d 1382, 1385 n. 2 (8th Cir. 1971). In that case, an employer was held to have subjected itself to a duty to arbitrate grievances pending contract renewal negotiations because it had volunteered to maintain its grievance procedures during that period. That case was decided narrowly upon its facts. The Supreme Court has not yet recognized a duty to continue to bargain over what was not a subject of mandatory bargaining in the first instance. See Allied Chemical Workers, Local 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 187-88, 92 S.Ct. 383, 401, 30 L.Ed.2d 341, 362 (1971). "No matter how lengthy the bargaining about a permissive subject, it never changes into a mandatory subject." C. Morris, The Developing Labor Law 425 (1971). See NLRB v. Davison, 318 F.2d 550, 557-58 (4th Cir. 1963)
 
 
 [11]
 Litton was not named as an "employer" in any of the charges or complaints filed in this case prior to October 7, 1970, nor was it served with a copy of any of such documents. On October 7, 1970, the General Counsel filed and served upon Litton a notice of his intention to amend the complaints and to possibly include Litton in the action. The General Counsel's motion to amend the complaint was later withdrawn, however, and Litton withdrew from the proceedings. Testimony on the substantive issues of the case continued. On November 20, 1970, the complaint was amended to describe Royal Typewriter Company as a division of Litton Business Systems, and Litton Business Systems as a subsidiary of Litton Industries, Inc
 On December 1, 1970, counsel for Royal and LBS sought to add Litton as a party to the proceedings, but this motion was denied. The hearing on the substantive issues continued until February 5, 1971. Thereafter, on June 2, 1971, the General Counsel filed a motion with the trial examiner seeking to amend the complaint to include Litton. Following oral argument on this issue, the motion was denied. Thereafter, exceptions were taken to the Board, which directed that the hearing examiner reconsider this issue. The Administrative Law Judge again concluded that Litton should not be included in the suit as a party. The Board disagreed.
 
 
 [12]
 In upholding those of the Board's findings which are at variance with those of the Administrative Law Judge, we are mindful of the Supreme Court's cautionary statement that contrary findings of an administrative law judge, especially on credibility issues, may make the evidence supporting the Board's findings "less substantial" in applying the "substantial evidence" standard. Universal Camera Corp. v. NLRB, 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456, 471 (1951). See NLRB v. Arkansas Grain Corp. 392 F.2d 161, 164-65 (8th Cir. 1968); Acme Products, Inc. v. NLRB, 389 F.2d 104, 106 (8th Cir. 1968). We do not read the Board's opinion as rejecting all unfavorable testimony, but simply, in the absence of credibility findings by the Administrative Law Judge, as exercising its responsibility to assess the testimony in the light of the record as a whole
 
 
 [13]
 See note 11, supra, for the procedural background of this case concerning Litton
 
 
 [14]
 See note 1, supra
 
 
 [15]
 The Board excluded from its reinstatement orders two men convicted of criminal offenses in connection with a shooting which occurred during the strike, but away from the picket line
 
 
 [16]
 The Royal plant and equipment at Springfield have been sold. There remain two plants operated by Litton divisions in the Springfield area
 
 
 [17]
 We have separately considered the Union's Renewed Motion for Leave to Adduce Additional Evidence. The facts sought to be proved (broad ranging charges of misconduct by Litton) are essentially collateral to the cases before us, have not been submitted to the Board, and even if proved would not cause us to conclude that the findings of the Board or the discretion which it exercised in fashioning the remedy require reversal. The motion is denied